# Exhibit D

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

CAUSE NO:  1:17-cv-01731-WTL-MPB

KRYTIERE CHANEL WILKINS,   )
                           )
          Plaintiff,       )
                           )
     vs.                   )
                           )
MED-1 SOLUTIONS, LLC,      )
                           )
          Defendant.       )


     The 30(b)(6) deposition upon oral examination
of MICHAEL R. JUDE, a witness produced and sworn
before me, Linda C. Callahan, a Court Reporter and
Notary Public in and for the County of Hamilton,
State of Indiana, taken on behalf of the Plaintiff
in the offices of Med-1 Solutions, 517 U.S.
Highway 31 North, Greenwood, Johnson County,
Indiana, on the 20th day of June, 2018, commencing
at 11:58 p.m., pursuant to the Federal Rules of
Civil Procedure, and by Notice of the parties as
to time and place thereof.


Job No. 28336



**EcoScribe Solutions**
www.EcoScribeSolutions.com
888.651.0505

1

       IN THE UNITED STATES DISTRICT COURT

2
         SOUTHERN DISTRICT OF INDIANA
           INDIANAPOLIS DIVISION

3

        CAUSE NO:  1:17-cv-01731-WTL-MPB

4

KRYTIERE CHANEL WILKINS,    )

5
                    )
         Plaintiff,     )

6
                    )
    vs.             )

7
                    )
MED-1 SOLUTIONS, LLC,     )

8
                    )
        Defendant.     )

9

10

11
     The 30(b)(6) deposition upon oral examination
of MICHAEL R. JUDE, a witness produced and sworn

12
before me, Linda C. Callahan, a Court Reporter and
Notary Public in and for the County of Hamilton,

13
State of Indiana, taken on behalf of the Plaintiff
in the offices of Med-1 Solutions, 517 U.S.

14
Highway 31 North, Greenwood, Johnson County,
Indiana, on the 20th day of June, 2018, commencing

15
at 11:58 p.m., pursuant to the Federal Rules of
Civil Procedure, and by Notice of the parties as

16
to time and place thereof.

17

18

19

20

21

22

23
Job No. 28336

24

25

```
 1                 A-P-P-E-A-R-A-N-C-E-S

 2

     FOR THE PLAINTIFF:
 3   ATLAS CONSUMER LAW
     BY:  ERIC D. COLEMAN, ESQ.
 4   2500 S. Highland Avenue
     Suite 200
 5   Lombard, IL 60148
     (Via telephone)
 6
     FOR THE DEFENDANT:
 7   MED-1 SOLUTIONS, LLC
     BY:  NICHOLAS D. MOLINE, ESQ.
 8   517 S. U.S. Highway 31 North
     Greenwood, IN 46142
 9


10
          I-N-D-E-X   O-F   E-X-A-M-I-N-A-T-I-O-N
11
                                      PAGE
12
     BY MR. VOLHEIM:                   3, 70
13
     BY MR. MOLINE:                    69
14

15           I-N-D-E-X   O-F   E-X-H-I-B-I-T-S

16
     REFERRED TO, PREVIOUSLY MARKED          PAGE
17
     A -              Notice                  19
18   B -  Defendant's responses, admissions  30
     C -  Defendant's first set, responses   32
19   E-   CHN account records                44

20   F -  Consent Agreement, 1-17-16         48
     G -      Consent agreement, 63863        51
21   H -      Consent agreement, 85914        51
     I -          Account notes, FACS         56
22   J -          Skiptrace results           61

23   K -          214 page start              66
     L -          Call records                66
24

25
```

1                    MICHAEL R. JUDE,

2          the witness herein, having been first duly sworn

3          to tell the truth, the whole truth, and nothing

4          but the truth relating to said matter, was

5          examined and testified as follows:

6

7          DIRECT EXAMINATION,

8               QUESTIONS BY MR. ERIC D. COLEMAN:

9                    MR. COLEMAN:   Okay.  Good morning,

10         everyone.  This is the deposition of Med-1

11         Solutions, LLC pursuant to Rule 30 of the

12         Federal Rules of Civil Procedure.  This

13         deposition is being taken telephonically by

14         agreement of the parties.  I am plaintiff's

15         counsel, and my name is Eric Coleman.  I am

16         located at 2500 South Highland Avenue, Lombard

17         Illinois.  I believe defendants designated

18         witness is located at 517 U.S. Highway 31 North,

19         Greenwood, Indiana.  This is a deposition of the

20         Southern District of Indiana case labeled

21         Krytiere Chanel Wilkins v. Med-1 Solutions, LLC,

22         Case No. 17-cv-01731.

23    Q.   Sir, would you please state your name for the

24         record.

25    A.   Michael Jude.

1    Q.    Thank you, Mr. Jude.  Have you ever been deposed

2          before?

3    A.    Yes.

4    Q.    How many times?

5    A.    Four, I believe.

6    Q.    Okay.  And were all those times in your capacity

7          working for Med-1?

8    A.    Yes.

9    Q.    So you've never been deposed for anything that

10         was not related to being a witness for Med-1?

11   A.    No.

12   Q.    Okay.  In those cases where you were deposed, was

13         Med-1 the defendant?

14   A.    Yes.

15   Q.    Okay.  When was the last time you were deposed?

16   A.    A couple months ago, I think March.

17   Q.    Okay.  So within the last year?

18   A.    Yes.

19   Q.    And that was in your capacity working for Med-1?

20   A.    Yes.

21   Q.    Do you happen to remember the case number for

22         that case?

23   A.    I do not.

24   Q.    Do you remember the name of the case?

25   A.    No, I do not; I'm sorry.

| 1  | Q. | Okay.  No problem.  Other than the deposition you |
| 2  |    | just mentioned, have you ever testified in any |
| 3  |    | other lawsuit? |
| 4  | A. | Only -- all four. |
| 5  | Q. | Okay.  But nothing aside from those four? |
| 6  | A. | Correct. |
| 7  | Q. | Okay.  So seeing as how you have been deposed |
| 8  |    | before, I'm sure you are familiar but I have to |
| 9  |    | ask, are you familiar with how depositions work |
| 10 |    | procedurally? |
| 11 | A. | Yes. |
| 12 |    | MR. COLEMAN:  Even so, I'm still |
| 13 |    | going to go over a few preliminary things.  Let |
| 14 |    | me know -- if you need to take a break at any |
| 15 |    | point, please free to do so.  The only thing I |
| 16 |    | would ask is that you make sure to respond to any |
| 17 |    | pending questions before you take a break.  I'll |
| 18 |    | try and time it out, you know, if we're going for |
| 19 |    | a while, every hour, just checking to see if you |
| 20 |    | need a break, but if anything pops up in between |
| 21 |    | when I ask, feel free to let me know and we can |
| 22 |    | take a break.  Also, to make Linda's life a |
| 23 |    | little easier, please wait until I finish asking |
| 24 |    | my full question before you respond; she can't |
| 25 |    | have both of us talking over one another.  I know |

1        it's a little hard since we're not all in the

2        same room, but if you do not understand a

3        question, please let me know and I can do my best

4        to rephrase it.

5            Also, your attorney may be objecting to some

6        of the questions I will be asking today, so if he

7        does -- if he does so, before responding to my

8        question, please wait for him to get his

9        objection on the record.  He will instruct you

10       whether or not to answer the question.  Do you

11       have any questions about anything I just

12       mentioned.

13                    THE WITNESS:  No, sir.

14  Q.   Okay, great.  All right.  Well, Mr. Jude, how old

15       are you?

16  A.   46.

17  Q.   Okay.  Are you currently under the influence of

18       any drugs or alcohol?

19  A.   No.

20  Q.   Are you currently taking any prescription

21       medication?

22  A.   No.

23  Q.   So is there anything that would impair your

24       ability to tell the truth in today's proceeding?

25  A.   No.

1   Q.   Okay, great.  What state do you reside in?

2   A.   Indiana.

3   Q.   Okay.  And did you graduate from high school?

4   A.   Yes.

5   Q.   What is the name of that high school?

6   A.   Matewan High School, M-A-T-E-W-A-N, in Matewan,

7        West Virginia.

8   Q.   Okay.  And when did you graduate?

9   A.   1990.

10  Q.   And did you attend any college?

11  A.   I did, yes.

12  Q.   Which college?

13  A.   Pikeville College, P-I-K-E-V-I-L-L-E, from

14       Pikeville, Kentucky.

15  Q.   And when did you graduate from there?

16  A.   1994.

17  Q.   Okay.  And what did you study while there?

18  A.   Accounting and business management.

19  Q.   Okay.  After college, did you go to any sort of

20       graduate school?

21  A.   No.

22  Q.   Okay.  Any trade schools?

23  A.   No.

24  Q.   Any type of schools post college?

25  A.   No.

1  Q.   Okay.  Do you hold any profession certifications?

2  A.   No.

3  Q.   Okay.  Have you been convicted of any felonies?

4  A.   No.

5  Q.   Have you ever been arrested?

6  A.   No.

7  Q.   Have you ever been charged with any crimes?

8  A.   No.

9  Q.   Have you ever sued anyone before?

10 A.   No.

11 Q.   Have you ever been sued by anyone in your

12      personal capacity?

13 A.   No.

14 Q.   Okay.  Turning to the nature of your employment

15      with Med-1, what is your current job title at

16      Med-1?

17 A.   Collections floor manager.

18 Q.   And how long have you been in that role?

19 A.   I've been in that role for about three years.

20 Q.   Okay.  Before this role, did you have a different

21      job title at Med-1?

22 A.   Yes.

23 Q.   And what was it?

24 A.   I was the corporate trainer prior to that.

25 Q.   Okay.  How long were you in that role?

1    A.    About four years.

2    Q.    Have you had any other roles with Med-1?

3    A.    Yes.  I was a collector for about a year, and I

4          had a short stint as department manager for a

5          non-collections department for a few months.

6    Q.    Okay.  So throughout your employment with Med-1,

7          have you ever been responsible for placing calls

8          to consumers, collection calls?

9    A.    Yes.

10   Q.    Okay.  And in your current role, how would you

11         describe your -- or what would you describe your

12         job functions at Med-1?

13   A.    I oversee the daily -- daily production, I'm

14         directly over all of the team managers who are

15         over the collection floor.

16   Q.    Okay.  If you could, to the extent you already

17         answered, or to the extent you did not already

18         answer, could you walk me through what a typical

19         day is like in terms of what you do in your

20         current role at Med-1?

21   A.    I wish there was a typical day.  I'm -- mainly

22         I'm going -- I do mostly reporting -- I'll spend

23         probably half my day analyzing reports and

24         statistics from -- from the previous day, week,

25         month, and then the other half of the day is

```
 1         pretty much kind of direct, one-on-one with

 2         either management or the staff or answering

 3         questions.

 4    Q.   Okay.  So I would imagine that you, in your

 5         current role, you do manage employees of Med-1;

 6         is that correct?

 7    A.   Correct, yes.

 8    Q.   Approximately how many employees do you manage?

 9    A.   About 50.

10    Q.   Okay.  And where is Med-1 located?

11    A.   It's 517 U.S. Highway 31 North, Greenwood,

12         Indiana, 46142.

13    Q.   Okay.  So is there more than one location?

14    A.   No.

15    Q.   So at your location in Greenwood, is Med-1

16         organized in different departments?

17    A.   I don't think -- I'm not sure what you're asking.

18    Q.   I guess -- well, you seem to work in the

19         collection department.  Is there, let's say, a

20         management department, is there a legal

21         department, are there sort of different

22         departments under the overall umbrella of Med-1?

23    A.   Yes.  Med-1 would be collections and legal.  I'm

24         over the collections department.

25    Q.   So it's really just a collections and legal
```

1          department, that's about it?

2     A.   Under the Med-1 umbrella, yeah.

3     Q.   So the employees you manage, they are also under

4          the collections department?

5     A.   Correct.

6     Q.   Okay.  And I understand that you, in one of your

7          older roles with Med-1, you were responsible for

8          placing telephone calls to consumers.  Is that

9          still part of your job function?

10    A.   Very rarely, only if it's an escalated call that

11         makes it to me that needs a call back.

12    Q.   We're going to shift gears a little bit.  Look at

13         the training that Med-1 goes through.  When you

14         first started working at Med-1, did you have to

15         engage in any kind of training program?

16    A.   Yes.

17    Q.   Can you give me an overview of what that training

18         program was?

19    A.   Yes.  At that time, new-hire training was a

20         one-week program, classroom and hands-on.  The

21         classroom part of it was over compliance, company

22         systems, customer service, and then the hands-on

23         was kind of taking all of that, watching, doing

24         side-by-sides, learning the system that way.

25    Q.   And when you say compliance training, what was

1        covered in the compliance training?

2   A.   At the time, it was obviously mainly FDCPA, HIPAA

3        and identify theft prevention.

4   Q.   Was the Telephone Consumer Protection Act, we'll

5        refer to that as the TCPA for shorthand, was the

6        TCPA included in the training?

7   A.   In the initial, I don't think it was -- we didn't

8        have like an actual class, and it was mentioned

9        but there was no TCPA program, per se.

10  Q.   Okay, I gotcha.  Now, in your current role and

11       based on the knowledge you gained through your

12       current role with Med-1, what is your

13       understanding of the TCPA?

14  A.   The TCPA is designed to prevent unwanted or un --

15       calls to cell phones without -- or from an

16       automated dialer without a person's consent.

17  Q.   Okay.  And under your understanding of the TCPA,

18       can a company call a customer's cellular phone

19       using a pre-recorded message without that

20       consumer's consent?

21  A.   No.

22  Q.   And under your understanding of the TCPA, can a

23       company call a consumer's cellular phone using an

24       automatic telephone dialing system without that

25       consumer's consent?

1   A.   No.

2   Q.   I know you mentioned that the FDCPA was part of

3        the compliance training you received when you

4        began working for Med-1.  What did that training

5        consistent of as related to the Fair Debt

6        Collection Practices Act?

7   A.   It was an ACA, American Collection Association

8        video -- excuse me, video Flash-Player-style

9        course, online course, it was about a two- to

10       three-hour course, and then there was an online

11       test that you had to take with a passing grade of

12       85 percent to be able to move forward.

13  Q.   Okay.  And since the initial training you

14       received on the FDCPA, have you received any

15       further training?

16  A.   No, not in a -- not as far as like a -- going

17       to -- to any kind of like conferences or

18       anything.  We do an annual compliance training

19       yearly here.

20  Q.   Okay.  And is that compliance training for all

21       Med-1 employees?

22  A.   Yes, yes, I'm sorry.

23  Q.   Okay.  So based on all this training you received

24       initially and the annual sort of training that

25       Med-1 engages in, what is your understanding of

1              the FDCPA?

2    A.    Well, it's -- it's designed to eliminate unfair

3          debt collection practices.

4    Q.    Okay.  And while I understand the statute is

5          pretty technical and broad in nature, to the best

6          of your understanding and knowledge, what does

7          the FDCPA prohibit?

8    A.    Prohibits -- prohibits lot of things.  Prohibits

9          speaking to third parties without permission,

10         prohibits harassment, misleading -- I'm trying to

11         remember all the statutes now.  Certain time --

12         time restrictions for calling, prohibits any kind

13         of deceptive acts.

14   Q.    Okay.  And -- I'm sorry, I didn't mean to cut you

15         off or --

16   A.    No, that's fine.

17   Q.    Okay.  So also within the compliance training you

18         received, was the Indiana Deceptive Consumers

19         Sales Act, the IDCSA for short, included in any

20         of this training?

21   A.    Not specifically, no.

22   Q.    Okay.  So I understand you may not have been

23         trained on this, do you have any understanding of

24         what the IDCSA is?

25   A.    Only through my own research, but I -- it kind of

```
 1            mirrors the FDCPA and any other unfair collection
 2            practices, regulations out there.
 3    Q.     Okay.  I know you mentioned HIPAA.  Obviously we
 4            covered the FDCPA, TCPA, and IDCSA.  Are there
 5            any other laws that you were trained on?
 6    A.     Go over Fair Credit Reporting Act briefly, that's
 7            about it.
 8    Q.     Okay.  And when you first started working at
 9            Med-1, I believe I may have already -- did you
10            testify that was a week-long course; is that
11            correct?
12    A.     Correct, as far as the classroom, the -- the
13            hands-on, you know, the first month was kind of a
14            training month, but as far as the official
15            training program, it was the first week.
16    Q.     Okay.  And as you sort of progressed and were
17            promoted within Med-1, were you required to
18            complete any training for sort of the next role
19            you would be transitioning into?
20    A.     Yeah.  It wasn't a course, but obviously,
21            transitioning into more than of a train --
22            training as far as how to -- systems and
23            reporting and that kind of stuff, yes.
24    Q.     Okay.  So in your current role at Med-1, who
25            would you say is your immediate supervisor?
```

 1  A.  Francis Niper, our senior attorney.

 2  Q.  Okay.  And what is their title?  I'm sorry,

 3      senior attorney?

 4  A.  Yes.

 5  Q.  Okay.  Are there any other individuals who you

 6      have to report to?

 7  A.  I report to Jennifer Taylor who is vice president

 8      of business development, I think is her current

 9      title, and Allie Winger who is our HR director.

10  Q.  Okay.  And during your time of employment at

11      Med-1, have you ever been reprimanded or written

12      up for any of your conduct?

13  A.  No.

14  Q.  Okay.  And thank you for providing me with all

15      that information.  So Mr. Jude, are you aware as

16      to how many times Med-1 has been sued for

17      violations of the FDCPA, TCPA, or the IDCFA?

18  A.  I do not know.

19  Q.  Okay.  Do you know whether this case is the only

20      one?

21  A.  No, it's not the only one.

22  Q.  Okay.  If you had to guess, would you say it's

23      more than five?

24  A.  Yeah, I would say more than five.

25  Q.  Okay.  What about more than ten?

1   A.   Honestly, I -- I wouldn't able to put a number to

2        it.

3   Q.   If a lawsuit is filed against Med-1, when do you

4        typically become aware of that lawsuit?

5   A.   Me personally?

6   Q.   Yes.

7   A.   Probably -- well, obviously depending on what the

8        nature of the lawsuit is, if it's -- if it's

9        regarding something collection related, pretty

10       quickly to -- you know, just to be made aware and

11       to tend to start prepping any, you know, needed

12       documents for it.

13  Q.   Okay.  And so approximately when did you first

14       learn of this lawsuit?

15  A.   This one?  About a year, a little over a year

16       ago, maybe.

17  Q.   And how was it brought to your attention?

18  A.   At that time, our -- the attorney, Tara Gerber,

19       had either called me or e-mailed me to let me

20       know that she needed some information.

21  Q.   Okay.  And besides providing your testimony in

22       depositions as well as your role in preparing

23       documents related to the litigation, what other

24       involvement, if any, do you have with regard to

25       lawsuits filed against Med-1?

```
 1   A.    That would be pretty much it.

 2   Q.    Okay.  Does Med-1 have an in-house legal

 3         department?

 4   A.    Yes.

 5   Q.    And I believe you may have already testified to

 6         this, but do you have direct contact with anybody

 7         in the legal department at Med-1?

 8   A.    Yes.

 9   Q.    And who is that?

10   A.    Well, Francis Niper is my direct supervisor, but

11         I mean, there -- there will be times when I will

12         need to get in touch with management or other

13         attorneys from the legal department.

14   Q.    Okay.  Now, is Francis an attorney?

15   A.    Yes.

16   Q.    For this case that you're testifying in today,

17         did you prepare or assist in the discovery

18         responses?

19   A.    I did, yes.

20   Q.    Okay.  Any other involvement you can think of?

21   A.    No, not -- no.

22   Q.    Outside of speaking to your attorneys, did you do

23         anything additional to prepare for this

24         deposition today?

25   A.    No, just reviewed the account information and the
```

1      history.

2   Q.   Okay.  Have you discussed this case with anyone

3        other than your lawyers?

4   A.   No.

5   Q.   Okay.  And have you reviewed any documents in

6        preparation for this deposition?

7   A.   Yes, I have.

8   Q.   And what documents were those?

9   A.   That would have been all of the requests for

10       discovery and admissions, and then I'm sure one

11       of the exhibits is account notes and history.

12  Q.   Okay.  So at this time, I'm going to ask Linda to

13       hand you what's been pre-marked as Exhibit A.  It

14       should be Plaintiff's Notice of Deposition to

15       Defendants.

16  A.   Okay, I have it.

17  Q.   Okay.  Please flip through that and tell me when

18       you are done looking at it.

19  A.   Okay.

20  Q.   Have you seen this document before?

21  A.   I have, yes.

22  Q.   When did you first see it?

23  A.   I'm not sure of the date, but it was probably

24       pretty close to a month ago, maybe.

25  Q.   So it was before today?

```
1   A.   Yes.
2   Q.   Based on this document, is it your understanding
3        that Med-1 has designated you as the corporate
4        witness for all the topics that are outlined here
5        on the pages labeled two through five?
6   A.   Yes.
7   Q.   And are you comfortable testifying as to these
8        topics?  You may skim those over, if you'd like,
9        just to make sure.
10  A.   Yes.  There may be some technology questions that
11       I'm not a hundred percent on, but --
12  Q.   Okay.  And that's fine, I don't anticipate too
13       much of today's discussion revolving around the
14       technology aspect of defendant's dialing system.
15       Are there any topics that you're not comfortable
16       discussing, you know, aside from those
17       technology-related ones or that you don't feel
18       like you can testify to?
19  A.   I don't think so.
20  Q.   And if we come to a topic of questions throughout
21       this deposition and you don't know an answer,
22       please just let me know that, okay?
23  A.   Okay.
24  Q.   All right.  So on a more general level, what is
25       Med-1 Solutions?
```

 1  A.   Med-1 Solutions is a third-party debt collector

 2       that services medical -- past-due medical bills.

 3  Q.   Okay.  So what types of services does Med-1

 4       provide to its clients?

 5  A.   Debt collection, we have -- is obviously the

 6       main.  We provide legal services, and then we

 7       also have a client care department that kind of

 8       facilitates communication between the two.

 9  Q.   Okay.  And how long has Med-1 been in the

10       business of third-party collections?

11  A.   I think 15 years this month.

12  Q.   And does Med-1 collect on consumers nationwide?

13  A.   Not nationwide, but several states other --

14       primarily Indiana, but yes, we are licensed in

15       other states.

16  Q.   Do you happen to know what those states are?

17  A.   Not -- not off the top of my head, but I mean, I

18       can -- we can get that for you.

19  Q.   How does Med-1 obtain the accounts that it

20       subsequently goes about collecting on?

21  A.   They're -- they're transferred to us from our

22       clients, our hospitals.  We are kind of an

23       extension of their billing department, so once an

24       account becomes flagged as past due or delinquent

25       on their end, they will automatically be loaded

 1        into -- sent to our system and loaded into our

 2        accounts -- or loaded into our system, sorry.

 3    Q.  Okay.  So are you familiar with Community Health

 4        Network?

 5    A.  Yes.

 6    Q.  I'm going to refer to them as CHN for short going

 7        forward.

 8    A.  Okay.

 9    Q.  So what is CHN?

10    A.  Community Health Network is one our clients

11        that -- that we provide collection services for.

12    Q.  Okay.  How would you describe the relationship

13        between CHN and Med-1?

14    A.  I'm not sure kind of what you're looking for

15        there.

16    Q.  Okay, I'll rephrase.  So CHN turns its delinquent

17        accounts over to Med-1 for third-party

18        collection; correct?

19    A.  Correct.

20    Q.  Okay.  And so after Med-1 obtains an account from

21        CHN, what is the typical process on Med-1's end

22        after it receives an account from CHN?

23    A.  The account will be loaded into our collection

24        database software, it will be sent a -- an

25        initial collection letter, it will go through a

```
 1            series of automated processes to check for

 2            bankruptcies, death notices, cell phone scrubs,

 3            and then after -- after about a week to ten

 4            days, the system will -- will determine what kind

 5            of work status it needs to be in, and then if

 6            it's -- if it's deemed something that needs to

 7            be, you know, on a call status, it will go to or

 8            normal workflow.  And if it's kind of -- you

 9            know, if we see it's a passed-away account or

10            bankruptcy or something like that, it will kind

11            of go into a non-working status.

12     Q.     Okay.  And I believe you mentioned that your

13            system sends a letter to consumers.  Is this

14            letter automatically sent when information is

15            loaded in from CHN?

16     A.     It's automatically requested and then reviewed

17            and -- for Community, any in-state accounts, the

18            letters will be prepped and signed by one of our

19            attorneys.

20     Q.     Now, about how long after receiving an account

21            from CHN, about how long will it take Med-1 to

22            begin contacting that consumer?

23     A.     Contacting by phone, usually within about the

24            first 10 to 14 days.

25     Q.     And how does Med-1 obtain phone numbers of
```

```
 1        consumers or the accounts that it is collecting

 2        on?

 3   A.   Initially, they would be provided from whatever

 4        Community in this case would send to us.

 5   Q.   So are you familiar with Ms. Wilkins' information

 6        as it was provided to CHN?

 7   A.   Yes.

 8   Q.   And are you aware as to how CHN obtained Ms.

 9        Wilkins' phone number?

10   A.   It's my understanding that would have just been

11        done through their registration process.

12   Q.   Okay.  And when Med-1 receives data from one of

13        its clients such as a CHN, what format does that

14        data come in?

15   A.   I know there will -- they're uploaded into our

16        FTP site, normally.  I think they probably come

17        in as an Excel CSV file.

18   Q.   Okay.  So CHN sends their data in an Excel file,

19        I'm sorry, is that what you said?

20   A.   I don't know that for a hundred percent for CHN,

21        but I know it's -- it's sent electronically

22        through our -- from them to us, yes.

23   Q.   Okay.  And then how does Med-1 import that data

24        into its own system?

25   A.   Our IT department will take the file and manually
```

```
 1          run a process to upload all of those accounts.

 2   Q.   Okay.  So does your IT department use any kind of

 3        software program to perform this function?

 4   A.   It's through FACS, F-A-C-S, which is our

 5        collection software program.

 6   Q.   Okay.  And how long has Med-1 been using FACS?

 7   A.   As long as I've been here.  I don't know for the

 8        full 15 years, but I've been here for eight, and

 9        it's been in existence prior to that with us.

10   Q.   Okay.  Can you explain how FACS works, generally?

11   A.   It's a -- it's a Windows-based, kind of

12        point-and-click, fill in -- fill in the blanks,

13        it's -- the way that we use it, there will be

14        kind of pre-populated fields that will have

15        demographic information, it will have

16        contractors, you know, work disposition or status

17        codes, and then any other information that would

18        have been provided to us from the client, and

19        then the way that we would work it is, you know,

20        we'll, any -- any calls that are made, any -- any

21        documents that are scanned in, any conversations,

22        letters, you know, will all be documented in our

23        -- in the notes.

24   Q.   Okay.  So I think you touched on it, a few bits

25        of the information, but what kind of data is
```

```
 1          included when you received a new account from a

 2          client like CHN?

 3     A.   You know, it's -- I'm -- obviously, I'm not on

 4          that initial process, but it's primarily going to

 5          be demographic information, balance, date of

 6          service, account numbers.  Every now and then, it

 7          will have provider data in there such as maybe a

 8          doctor's name or insurance billing information,

 9          but primarily, it's going to be financial and

10          demographic.

11     Q.   Okay.  And that includes phone numbers?

12     A.   Correct, yes.

13     Q.   So when account information comes in from a

14          client like CHN and that data is then imported

15          into FACS, does Med-1 then run that data through

16          any other filters?

17     A.   Yes.  It will go through a bankruptcy, deceased

18          scan at that point, and then it will also go

19          through a cell phone scrub.

20     Q.   Okay.  So aside from those scrubs, are there any

21          other scrubs that Med-1 runs on the data?

22     A.   I'm sure there are, but I can't think of anything

23          specific at that point.

24     Q.   Okay.  To the best of your knowledge, is there a

25          scrub that Med-1 runs that checks whether a phone
```

1          number provided by CHN is in fact a cell phone

2          number?

3    A.    Yes.

4    Q.    And what sytem do you run this data through?

5    A.    It's through a company called LocateSmarter.

6          Currently -- I think LexisNexis is, I think, who

7          used to do that, but I think during the dates in

8          question here, it's been LocateSmarter.

9    Q.    And then I guess how does that scrub -- or how

10         does Med-1 determine whether or not the phone

11         number provided by CHN is a cell phone or a home

12         phone?

13   A.    That would be through -- through the

14         LocateSmarter process, and I'm sorry, I do not

15         know exactly what -- what system they use to --

16         to get that information, but it will come back as

17         either a cell phone or land line to us.

18   Q.    Now, did Med-1 run a scrub on Ms. Wilkins'

19         information?

20   A.    Yes.

21   Q.    And did any of these scrubs go about trying to

22         verify the information that was provided by CHN

23         to Med-1 in relation to Ms. Wilkins?

24   A.    Yes, it would -- it would verify whether it was a

25         cell phone or a land line.

```
 1   Q.   And is this the same sort of locate software or

 2        locate scrub that you were speaking about

 3        earlier?

 4   A.   Correct, yes.

 5   Q.   Aside from that scrub, did Med-1 do any

 6        independent verification of the information or

 7        the data that comes in from a client?

 8   A.   Not that I'm aware of, no.

 9   Q.   Okay.  So in situations where these scrubs turn

10        back some sort of results that meets -- or some

11        sort of information that results in the account

12        information needs to be changed or altered, how

13        does Med-1 or Med-1's system go about making

14        those changes?

15   A.   If we find -- if during the course of a call, we

16        would find that, you know, we gained consent or

17        lose -- you know, revoke consent, then that would

18        be manually changed by the person on the phone on

19        our side.

20   Q.   Okay.  Stepping back from that for a little bit,

21        how many employees does Med-1 have?

22   A.   I honestly don't know the question -- or the

23        answer to that.  It would be under 200.

24   Q.   Now, when Med-1 places phone calls to consumers

25        on accounts that it's collecting upon for its
```

```
 1           clients, does Med-1 place those phone calls

 2           directly?

 3   A.      Primarily, yes, any -- any manual dials.  We also

 4           employ an autodialer, as well.

 5   Q.      Okay.  So -- but Med-1 is directly placing the

 6           phone calls?

 7   A.      Correct.

 8   Q.      And what is the purpose of these phone calls?

 9   A.      It would be for debt collection purposes.

10   Q.      And now, does Med-1 -- I believe you testified to

11           this earlier, I just want to confirm; does Med-1

12           send letters to consumers?

13   A.      I'm sorry, what was the question?

14   Q.      Does Med-1 send letters to consumers?

15   A.      Yes, yes.

16   Q.      Do you know whether Med-1 ever sent any letters

17           to Ms. Wilkins?

18   A.      Yes, we did.

19   Q.      Okay.  Now, as -- through its role as a

20           third-party debt collector, is Med-1 subject to

21           the FDCPA?

22   A.      Yes.

23   Q.      And is Med-1 also subject to the TCPA?

24   A.      Yes.

25   Q.      Now, I would guess there is a collections
```

 1        department, but are -- is there a specific

 2        department that is designated with placing these

 3        collection calls to prospective or -- sorry, to

 4        consumers upon whom you are collecting?

 5   A.   Yes, that would fall both under collections, and

 6        legal departments would do that.

 7   Q.   Okay.  I'm now going to ask you to turn to

 8        Exhibit B.

 9   A.   B as in boy?

10   Q.   B as in boy, yes.

11   A.   Okay.

12   Q.   The title on the first page of that states

13        Defendant's Response for Plaintiff's Request for

14        Admissions.

15   A.   Yes.

16   Q.   Okay.  And are you familiar with this document?

17   A.   Yes, I've seen this.

18   Q.   Did you help prepare this document?

19   A.   I helped give some answers for this, yes.

20   Q.   Okay.  So you have seen this document before?

21   A.   I have, yes.

22   Q.   Okay.  Would you please take a few minutes to

23        look it over.

24   A.   Okay.

25   Q.   Okay.  Now, if you could, please turn to page two

1           of the document, Request for Admission No. 8.

2    A.    Okay.

3    Q.    Please read this request and Med-1's answer to

4           this request.

5    A.    Admit that all calls placed by you to plaintiff's

6           cellular phone number during the relevant time

7           period were not manually dialed by any

8           individual.  Answer:  Admit.

9    Q.    Okay.  So based on your understanding of Med-1's

10          response to this request, does Med-1 admit that

11          none of the phone calls it places to -- or that

12          it placed to Ms. Wilkins were manually dialed?

13   A.    No, I wouldn't think that's what it would be.

14   Q.    What do you understand Med-1's response to

15          Request for Admission No. 8 to mean?

16   A.    My understanding would be that not all were

17          manually dialed.

18   Q.    Okay.  Even though the request asks for an

19          admission that all calls placed by Med-1 to

20          plaintiff were not manually dialed?

21   A.    Yes.

22   Q.    Okay.  To what extent does Med-1 manually dial

23          consumer's phone numbers?

24   A.    Med-1 will manually dial any -- any phone numbers

25          that we do not have consent to use an autodialer.

 1   Q.   So if a manually-dialed phone call is placed by

 2        Med-1, that will be because it did not have

 3        consent to call that number?

 4   A.   Primarily, primarily, yes, or if it's someone

 5        requesting a callback or if -- you know, if we

 6        had a certain list of accounts that needed -- you

 7        know, that I wanted to -- a department to work

 8        that's not on like a call list or something,

 9        yeah, they would manually dial those.

10   Q.   Okay.  Now, Med-1 -- Med-1 does not manually dial

11        all of its calls; correct?

12   A.   That is correct.

13   Q.   And in situations where it does not manually dial

14        those phone calls, how are those phone calls

15        placed?

16   A.   Those calls would be placed through our automated

17        dialing system, through Noble Systems.

18   Q.   And that's the only way Med-1 itself would

19        directly place calls to consumers that were not

20        manually dialed?

21   A.   Yes.

22   Q.   All right.  You can go ahead and set Exhibit B

23        aside.  If could you please turn to Exhibit C?

24   A.   Exhibit C. Okay.

25   Q.   All right.  This document should be titled

1        Defendant's Response to Plaintiff's First Set of

2        Interrogatories?

3   A.   Yes.

4   Q.   Are you familiar with this document?

5   A.   Yes, I've seen this one before.

6   Q.   Did you help prepare this document?

7   A.   I helped with some of the responses, yes.

8   Q.   So you have seen this document before?

9   A.   Yes.

10  Q.   Could you turn to page five of the document,

11       looking specifically at Interrogatory No. 11.

12  A.   Okay.

13  Q.   Actually, strike that.  If you could please look

14       at page two of Med-1's response to Interrogatory

15       No. 3.

16  A.   Okay.

17  Q.   And could you please read that interrogatory for

18       me?

19  A.   Please list the time and date of all outgoing

20       calls placed by you to plaintiff's cellular phone

21       number during the relevant time period.  Please

22       list the name, address, and title of the each

23       employee who spoke with plaintiff over the phone

24       and the date each employee spoke to plaintiff

25       over the phone.

1   Q.   Okay, thank you.  Now, do you see the table

2        provided below that interrogatory?

3   A.   Yes.

4   Q.   What is the account number associated with that

5        table of phone calls provided in response to this

6        interrogatory?

7   A.   Account number 14700187.

8   Q.   Okay.  Thank you.  Now, if you would please look

9        to the portion of that table where it outlines

10       phone calls made on February 24th, 2017 and

11       March 3, 2017.

12  A.   Okay.

13  Q.   Looking at the type of call column, how does

14       Med-1's response to Interrogatory No. 3 state

15       that these phone calls on February 24th, 2017 and

16       March 3rd of 2017 were placed?

17  A.   Manual dial.

18  Q.   Okay.  And you testified earlier whenever a

19       manually dialed -- or whenever a number is

20       manually dialed, that typically indicates that

21       there was no consent to call that number; is that

22       correct?

23  A.   Typically, yes.

24  Q.   Okay.  And again, if these calls were not

25       manually dialed or if any of these calls were not

1        manually dialed, those calls would have been made

2        through an automatic system known as Noble

3        Systems; is that correct?

4   A.  On this one, there's four calls at the top that

5        looks like we used a company that we no longer

6        use, Intelligent Contacts.  That was a -- an

7        off-site call center that would also make manual

8        dials, and then if they had contact with the

9        consumer, they would -- the attempt was to try to

10       transfer the call, live call, to us.  And then

11       anything that says VoApps in that column is an

12       automated voice drop system that we use.

13  Q.  So you mentioned VoApps.  What exactly is VoApps?

14  A.  VoApps is a direct voicemail technology that

15       leaves messages on a cell phone without dialing a

16       cell phone.

17  Q.  Okay.  What is Med-1's relationship with VoApps?

18  A.  We will use VoApps to -- as a contact platform

19       for cell phones without consent to autodial.

20  Q.  Okay.  And now how does VoApps go about placing a

21       call a consumer upon whom Med-1 is attempting to

22       collect?

23  A.  As far as their technology on how it happens, I

24       do not know the answer to that.  I can -- I can

25       walk you through the process as far as us getting

1         the data to them, but that's about all I can --

2         all I could make it to.

3    Q.   Okay.  If you would please do that for me.

4    A.   Absolutely.  I personally oversee the VoApps

5         lists, and so we will -- I will run a report

6         through FACS, our collection software, for

7         accounts based on whatever that day's call

8         criteria is, and I will run that report, get

9         the information as far as the phone numbers and

10        our account numbers, and then upload that system

11        to -- or upload that report, that file to VoApps.

12             And at that point, I can schedule the time,

13        the pacing method, the time to start, time to

14        start -- you know, stop time, and start the --

15        start the transfer.

16             From -- from that to when the list is

17        finished, I don't have a whole lot of -- other

18        than just a working knowledge of how their actual

19        technology works, but at the end of the day, once

20        that campaign is completed, I will get a results

21        file back from VoApps' website which then I will

22        export into our system to update the account as

23        far as whether a voicemail was left or no answer,

24        disconnected, that kind of stuff.

25   Q.   Okay.  So if I'm understanding you correctly,

 1          essentially, you sort of set the campaign, you

 2          will set the parameters of the VoApps voicemail

 3          drops, you will then sort of provide that

 4          information to VoApps who then goes about leaving

 5          the direct voicemail drops?

 6    A.    Correct.

 7    Q.    Okay.  And what determines -- who primarily

 8          determines whether a call to a consumer is placed

 9          by VoApps or through other means?

10    A.    Just kind of inventory, amount.  The same account

11          could end up in both of those.  We may manually

12          dial a cell phone on Tuesday and then it may get

13          a VoApps voicemail next Thursday, so it's --

14          they're all built from the same criteria, which

15          in our system, we use it -- we'll call it a

16          disposition or a status, so all of these accounts

17          are primarily going to be in a -- what we would

18          call a 3-CEL status, 3 C-E-L status, that would

19          designate that it's a cell phone with no autodial

20          consent.

21    Q.    I'm sorry, you said 3-CEL -- what was that about

22          3-CEL?

23    A.    We'll call it a status or disposition.  3-CEL

24          would be what we would -- what we would describe

25          as a -- all phone numbers on an account would be

1         listed as a cell phone without auto dial consent.

2   Q.    Does Med-1 have control of the voicemails that

3         are left by VoApps to the consumers upon whom

4         Med-1 is attempting to collect?

5   A.    Yes, we create a WAV file.

6   Q.    Okay.  And what is the substance of the message

7         that gets left by VoApps on consumers'

8         voicemails?

9   A.    I don't think I could recite it word for word,

10        but mainly, it says, you know, this is -- this is

11        a message from Med-1 Solutions, and it's an

12        attempt to collect a debt.  Call us at

13        888-323-0881.

14  Q.    Okay.  But that voicemail does not identify that

15        it's coming from VoApps at all?

16  A.    Correct.

17  Q.    Okay.  Now, if you could please turn -- turning

18        back to Exhibit C, if you could go to page seven

19        of that document, Interrogatory No. 17?

20  A.    Okay.

21  Q.    Read this interrogatory and Med-1's response.

22  A.    Okay.  State how and when you obtained

23        plaintiff's cellular phone number.  Response:

24        Defendant and agent for collection received

25        plaintiff's phone number from its principal, the

1          medical services provider.  Three accounts were

2          referred to defendant on the following dates.

3     Q.   You can stop there, thank you.

4     A.   Okay.

5     Q.   So Med-1 had three separate accounts related to

6          the plaintiff; correct?

7     A.   Correct.

8     Q.   Okay.  What are Med-1 policies as they relate to

9          collecting on multiple counts from the same

10         consumer?

11    A.   Normally, -- well, it's based on the client, but

12         normally, if we have -- if we find that we have

13         multiple accounts for the same consumer, those

14         will all get tied in together as just one lump

15         route -- route balance, and then we -- you know,

16         calls will be made, will be made from that one

17         account.

18              It does kind of depend on, like I said, the

19         client.  If we get an account from a different

20         client, those won't automatically tie into the

21         same route, but they will be listed under the

22         same kind of guarantor, so we would see that --

23         be able to see that they had six accounts versus

24         the three that we may be calling on.

25    Q.   Okay.  So you said all of the accounts sort of

1           get tied into the same route?

2    A.    Correct, that's -- usually, yes.

3    Q.    Okay.  And as it relates to this case, was it all

4          of those accounts have gotten tied into the Med-1

5          account 14700187?

6    A.    Correct.  That would have been what we would call

7          our seed account.

8    Q.    Okay.  And that would have been -- is that

9          because it was the first account that was placed

10         with Med-1?

11   A.    Correct, yes.

12   Q.    Okay.  Now, under Med-1's policies as they relate

13         to collecting on multiple accounts from the same

14         consumer, if a consumer filed a lawsuit against

15         Med-1, and after that lawsuit was filed, another

16         account was placed with you regarding that same

17         consumer that filed a lawsuit, would you initiate

18         collection efforts on the accounts placed with

19         Med-1 after the lawsuit was filed?

20   A.    It depends on how the account would load in.

21         I don't know that it would initially load in as

22         a -- as an account that would have a lawsuit

23         status on it, so the new account would probably

24         at least get an initial collection letter.

25   Q.    Okay.  An initial collection letter would go out

1        even though a lawsuit has already been filed?

2    A.  Unless it was -- unless it was immediately, you

3        know, loaded in as a do-not-contact or cease

4        communication status, yes, it's likely.  If it

5        loads in as a normal disposition, that -- that

6        first letter would at least get requested.

7    Q.  Okay.  Aside from a lawsuit kind of thing, if a

8        consumer had an account placed with Med-1 for

9        collection and Med-1 began contacting that

10       consumer on that account, and the consumer then

11       sends in a cease-and-desist letter asking that

12       the collection efforts cease, and after that

13       cease-and-desist letter was sent in, another

14       account was placed with Med-1 relating to the

15       same consumer, how would Med-1 go about

16       collecting on the subsequently-placed accounts?

17   A.  If we had a cease-and-desist letter, the existing

18       accounts would be -- or should be, at least,

19       changed into a cease communication status, and

20       then the phone numbers should also be marked as

21       do-not-call, and under the -- under the current

22       account loading process, if -- if an account -- a

23       new account came in with, say, the same phone --

24       address, phone number, if it's marked as a

25       do-not-call in -- anywhere in the system, that

1    new number is going to automatically get flagged

2    with the do-not-call, as well.

3  Q.  So basically, Med-1 would not collect on the

4    subsequently-placed account because of the

5    previous cease-and-desist, at least not if the

6    same information was provided on the previous

7    account?

8  A.  As long -- yeah.  I mean, as long as the existing

9    data was -- was updated in our system to show do

10   not call, the current way that the new accounts

11   load in, that -- we call it a phone flag, then

12   the do-not-call phone flag would copy over to any

13   other instance of that phone number, including a

14   new account loading in.  No, under -- and I'm not

15   sure how long that -- that phone flag copying has

16   been going on, but probably, you know, a year or

17   so, maybe.

18       Prior to that, if a new account came in,

19   it's -- you know, again, it probably would at

20   least get the initial letter, but it may or may

21   not be copied on the phone flag.

22  Q.  Okay.  Now, we'll change the situation a little

23   bit.  If Med-1 was collecting on an account

24   relating to a particular consumer and they

25   started collecting on that account and another

 1           account was placed with you for collection and

 2           you began collecting on that account, would those

 3           two accounts essentially be linked; correct?

 4    A.    Can you repeat that?  I'm sorry.

 5    Q.    Sorry.  So if a consumer basically has two

 6           accounts placed with you, with Med-1, and Med-1

 7           begins collecting on those accounts, those two

 8           accounts would be linked together?

 9    A.    As long as they're from kind of the same client,

10           yes, they should be automatically linked

11           together.  Even if it's different client, they're

12           going to be linked together in a way where we may

13           see two different routes of accounts, but we'd

14           see them together on the same screen.

15    Q.    Now, when these accounts are linked and a

16           consumer makes a payment in relation to one of

17           the phone calls that Med-1 is making, how does

18           Med-1 go about determining which of those

19           accounts to apply the payment to?

20    A.    Whatever account that the payment is -- is taken

21           from, so let's say we have four accounts, we

22           would only -- all of the work would be done from

23           the seed account or that main one account, and

24           the -- any payments would be applied

25           automatically to -- to the first, second, third,

1      or fourth, in order.

2            If someone were to request specifically that

3      they only wanted that payment to be applied to

4      account number three, then we would have to have

5      our accounting department manually switch that

6      over.

7  Q.  Okay.  So generally, Med-1 will apply any payment

8      that's not specifically designated for a

9      particular account to the first account?

10 A.  Correct.  Not necessarily the first account, but

11     whatever one we have as the seed account, which

12     should be the first account.

13 Q.  Now, you can set aside Exhibit C for now,

14     although we will be coming back to it, so I would

15     keep it handy.

16 A.  Okay.

17 Q.  If we could please turn to Exhibit E.

18 A.  Okay.

19 Q.  Now, are you familiar with this document?

20 A.  Yes, I've seen it before.

21 Q.  Okay.  Please takes a few minutes to look it

22     over.

23 A.  Okay.

24 Q.  Okay.  Now, looking at pages two to four of this

25     document, there's a portion that outlines patient

| | | |
|---|---|---|
| 1 | | demographics at time of discharge. |
| 2 | A. | Yes. |
| 3 | Q. | Okay.  Does this section reflect the information |
| 4 | | that was provided to CHN at the time plaintiff |
| 5 | | was discharged from CHN? |
| 6 | A. | That's my understanding of it, yes. |
| 7 | Q. | Okay.  So in looking at the second page of this |
| 8 | | document which I believe should reference |
| 9 | | account -- CHN Account No. 90401575323? |
| 10 | A. | Yes. |
| 11 | Q. | So that would be Med-1 Account No. 14700187; |
| 12 | | correct? |
| 13 | A. | That would be correct, yes. |
| 14 | Q. | Now, you can look back at Interrogatory No. 17 |
| 15 | | for reference to that.  Okay.  So looking at the |
| 16 | | phone numbers associated with Ms. Wilkins, at the |
| 17 | | time of discharge for Med-1 account 14700187, |
| 18 | | what was the phone number provided by Ms. Wilkins |
| 19 | | to CHN at the time of discharge in relation to |
| 20 | | this account? |
| 21 | A. | 317-992-4629. |
| 22 | Q. | Did she provide any other numbers? |
| 23 | A. | It doesn't appear so at that time, no. |
| 24 | Q. | Okay.  You can go ahead and turn to page three of |
| 25 | | Exhibit E.  This again should be in relation to |

```
1          CHN.

2    A.    Yes.

3    Q.    Except the CHN account number is 90401636213, and

4          again, that would be related to Med-1 Account No.

5          15368863, correct?

6    A.    Yes.

7    Q.    And again, looking at the phone numbers

8          associated with Ms. Wilkins at the time of

9          discharge for Med-1 Account 15368863, what was

10         the phone number provided to CHN by Ms. Wilkins?

11   A.    317-992-4629.

12   Q.    Okay.  And again, did she provide any other

13         numbers at the time of discharge in relation to

14         this account?

15   A.    It doesn't appear so, no.

16   Q.    Now, if you'd turn to page four of that document,

17         again, it's going to be the same deal.  This

18         document references CHN Account No. 90401721672

19         which would be Med-1 Account No. 15985914;

20         correct?

21   A.    Yes.

22   Q.    Okay.  And looking get at the demographic

23         information provided by Ms. Wilkins at the time

24         of discharge, what phone numbers were provided to

25         CHN by Ms. Wilkins?
```

1   A.   The same, 317-992-4629, and then also

2        317-400-7737.

3   Q.   Okay.  So in relation the account -- Med-1

4        Account No. 15985914, that Ms. Wilkins provided

5        the 7737 number; correct?

6   A.   Correct.

7   Q.   And this was the first time she provided that

8        number to CHN?

9   A.   It appears so, yes.

10  Q.   Okay.  And looking at that document, what did

11       CHN -- or what was the designation for the phone

12       number ending in 7737 as outlined in CHN

13       demographic information?

14  A.   They have it outlined as a home phone.

15  Q.   So just to sort of recap, Ms. Wilkins did not

16       provide the phone number ending in 7737 in

17       reference to either Med-1 account 14700187 or in

18       reference to account 15368863?

19  A.   Correct, yes.

20  Q.   Go ahead and turn back -- actually, you don't

21       need to pull it out.  Turning back to your

22       earlier testimony regarding the leaking of

23       accounts and the one seed account and things like

24       that, so essentially, Med-1 called to a consumer;

25       when they made one call regarding the seed

1      account, the account is a call for all the

2      accounts; is that correct?

3   A.    If they are tied together, I do believe it would

4      update as a call for each of the three, yes.

5   Q.    Okay.  Now, are there any situations when two

6      accounts relating to the same consumer would not

7      be linked together?

8   A.    If -- yeah, if -- let's say that there were

9      Community Hospital and then you also went to St.

10     Mary's, those two clients may not necessarily

11     want their accounts tied to each other, or even

12     if you went to, in this instance, if it was a

13     Community North versus Community South, they

14     would have different client ID numbers in our

15     system, and they may or may not get fully

16     route-tied together.

17  Q.    Okay.  So in a situation where two accounts were

18     linked together coming from the same original

19     creditor like CHN, if the consumer received a

20     call regarding the seed account and asked that

21     those calls stop, orally, would collection effort

22     cease on all accounts?

23  A.    Yes, they should.

24  Q.    Okay.  Now, if we could please turn to Exhibit F.

25  A.    Okay.

1  Q.  All right.  Now, are you familiar with this

2      document?

3  A.  Yes, I've seen these before.

4  Q.  Now, if you could please turn to the last page of

5      the document.

6  A.  Okay.

7  Q.  This document was signed by Ms. Wilkins on

8      January 17th, 2016; correct?

9  A.  Yes, it looks like it.

10 Q.  Okay.  And then referring back to Exhibit E, page

11     two where you see at the top, there is a

12     discharge date?

13 A.  Yes.

14 Q.  So is this document Exhibit F associated with the

15     discharge date of January 17, 2016 as outlined in

16     page two of exhibit --

17 A.  Yes.

18 Q.  So is the document, Exhibit F, a consent

19     agreement that was signed by Ms. Wilkins in

20     relation to Med-1 account 140 -- 14700187?

21 A.  Yes.

22 Q.  So this is the -- if you could turn back to

23     Exhibit C.

24 A.  Okay.

25 Q.  And turn to Interrogatory 19.

1   A.   Okay.

2   Q.   If you could please read that interrogatory and

3        the response.

4   A.   State how and when plaintiff provided you with

5        consent to be called on plaintiff's cellular

6        phone number.  Response:  Plaintiff signed a

7        consent agreement at the hospital and provided

8        her phone number.  Defendant never spoke with

9        plaintiff.  Plaintiff never revoked her consent.

10  Q.   You can stop there.

11  A.   Okay.

12  Q.   So is the document marked Exhibit F the consent

13       agreement as referred to in Med-1's interrogatory

14       response or response to Interrogatory 19 upon

15       which Med-1 bases its consent to contact Mrs.

16       Wilkins?

17  A.   Yes.

18  Q.   Okay.  Now, you also notice that Exhibits G and H

19       are substantially the same document as Exhibit F,

20       just signed on different dates.  If you could

21       please pull out those documents and take a look

22       at them very quickly.

23  A.   Okay.

24  Q.   And so based on the date of signature at the

25       last -- on the last page of both Exhibit G and

1         Exhibit H, can you determine that these consent

2         agreements refer to Med-1 accounts 15563863 and

3         15985914 respectively?

4    A.   Yes.

5    Q.   Now, if you could please turn to the second page

6         of either Exhibit F, G, or H, whichever one is

7         handy.

8    A.   Okay.

9    Q.   So on that second page, there should be a

10        paragraph that -- or there should be a bold title

11        that says, "Responsibility for payment", about

12        halfway down the page?

13   A.   Yes.

14   Q.   Okay.  And then the third paragraph under

15        "Responsibility for payment", about three lines

16        down, a third of the way over, a sentence starts

17        off, "If I provide"; do you see that?

18   A.   I do, yes.

19   Q.   Could you read that sentence for me?

20   A.   If I provide Community with my cell phone number,

21        I authorize Community or its agents to call my

22        cell phone either manually or by autodialer in

23        order to collect any amounts I owe.

24   Q.   Okay.  Now, is this the portion of the consent

25        agreement through which Ms. Wilkins purportedly

| | |
|---|---|
| 1 | gave consent to Med-1 to contact her cell phone? |
| 2 | A.   Yes. |
| 3 | Q.   And based on your reading of this clause, if a |
| 4 | home phone number was provided to CHN, would this |
| 5 | cause -- allow CHN or its agents to place phone |
| 6 | calls manually or via autodialer to such phone |
| 7 | number? |
| 8 | A.   It doesn't specifically state anything about home |
| 9 | phone. |
| 10 | Q.   Okay.  So that consent clause does not apply to |
| 11 | home phone numbers? |
| 12 | MR. MOLINE:  I'm going to object, |
| 13 | Eric.  I think that's a -- you're asking for a |
| 14 | conclusion of law here, a conclusion of contract |
| 15 | law more specifically. |
| 16 | MR. COLEMAN:  I'll rephrase, I'll |
| 17 | rephrase. |
| 18 | Q.   Based on your understanding as a lay person |
| 19 | through your employment at Med-1, would you |
| 20 | believe this clause allows CHN or its agents to |
| 21 | place cell phone calls manually or via |
| 22 | autodialers to a home phone number? |
| 23 | A.   I guess if it's a home phone number, my |
| 24 | understanding would be that there would be no |
| 25 | consent needed, anyway. |

1   Q.   Okay.  Now, similarly, based on your reading of

2        this clause as a layperson and through your

3        employment at Med-1, would this clause cover

4        phone calls placed by the entities which would

5        not be considered agents of CHN?

6   A.   No.

7   Q.   So in other words, that consent clause applies to

8        CHN and its agents?

9   A.   It's the way it reads, yes.

10  Q.   Okay.  So sort of reviewing what we have gone

11       over, at the time of discharge for Med-1

12       accounts, 14700187 and 155368863, Ms. Wilkins

13       only provided the number ending in 4629; is that

14       correct?

15  A.   For that date of service, yes.

16  Q.   And it was not until Med-1 account 15985914 that

17       Ms. Wilkins provided the phone number ending in

18       7737; is that correct?

19  A.   Correct, yes.

20               MR. COLEMAN:  Okay.  Now, Mr. Jude,

21       we've been going for about an hour.  Would you

22       like to take a break at all?

23               THE WITNESS:  Yeah, I could use a

24       quick one.

25               MR. COLEMAN:  Okay.  About 15

```
 1        minutes, 10 minutes?

 2                   THE WITNESS:  That's plenty of time.

 3        Ten is fine with me, but --

 4                   MR. MOLINE:  Eric, can you do 10?

 5        Is 10 enough for you guys?

 6                   MR. COLEMAN:  I'm sorry?

 7                   MR. MOLINE:  Can we do 10 minutes?

 8                   MR. COLEMAN:  Yeah, 10 minutes is

 9        perfect.  Be back in 10.

10                   (At this time, a recess was taken.)

11   Q.   Okay.  Mr. Jude, when we left off, we were

12        discussing the phone numbers that were provided

13        to CHN, as well as the consent documents Ms.

14        Wilkins signed when she provided those numbers to

15        CHN.  I just want to recap again.

16            So for Med-1 account Nos. 1470187 and

17        15368863, Ms. Wilkins only provided the number

18        ending in 4629; correct?

19   A.   That's correct, yes.

20   Q.   Okay.  So then based on the two consent

21        documents, Exhibits F and G which we established

22        were related to those two accounts respectively,

23        would Med-1 have had to consent to call Ms.

24        Wilkins on her 7737 number which were not

25        provided in relation to either of those accounts?
```

1                    MR. MOLINE:  Eric, I'm going to

2         object again.  Again, that's a conclusion of law

3         based on the -- the specific language in the

4         consent agreement and the contracts themselves.

5         I don't think Mike can answer that as it's going

6         to be a conclusion of law and not an issue of

7         fact here.

8                    MR. COLEMAN:  Okay, I'll rephrase.

9    Q.   So again, the 7737 number was not provided on

10        either 14700187 or 15368863, on those two

11        accounts; correct?

12   A.   Correct.

13   Q.   Okay.  And so in order for Med-1 to have consent

14        to contact a consumer, based on your knowledge as

15        a Med-1 employee, the numbers would have had to

16        have been provided to CHN; correct?

17   A.   Either to CHN or personally on -- on one -- in a

18        conversation with her.

19   Q.   Okay.  And how would Med-1 go about establishing

20        a conversation with a consumer?

21   A.   In our scripting, if we realize that we are

22        speaking to someone on a cell phone and we don't

23        have consent at that time, we will ask for

24        express consent to call and leave messages with

25        an automated dialer.

1    Q.    Okay.   Earlier, you testified that when Med-1

2          will manually dial a customer that is

3          typically -- or sorry, a consumer that is

4          manually dialed, the reason that it is manually

5          dialed is typically because there was no consent

6          to place that phone call via an autodialer;

7          correct?

8    A.    That is normally correct, yes.

9    Q.    Okay.   If you could refer back to Exhibit C and

10         the response to Interrogatory No.  3.

11   A.    Okay.

12   Q.    So on 2/24/2017 and 3/3/2017, those two phone

13         calls were manually dialed; correct?

14   A.    That's correct, yes.

15   Q.    So does that mean as of 2/24 and 3/3/17, Med-1

16         did not have consent to contact plaintiff via an

17         autodialer?

18   A.    That would have been the way that it was

19         reflected in our system at the time, yes.

20   Q.    And again, the response to Interrogatory No.  3

21         refers to account No. 14700187?

22   A.    That is correct.

23   Q.    Okay.   Thank you.   You can go ahead and set

24         Exhibit C aside for now.   If you could please

25         turn to Exhibit I.

1   A.   Okay.

2   Q.   All right.  Thank you.  Okay, now, are you

3        familiar with this document?

4   A.   Yes.

5   Q.   Okay.  And are you aware of what this document

6        is?

7   A.   Yes.  This would be account notes from our FACS

8        system.

9   Q.   Okay.  Based on, I guess, how the document is

10       presented in Exhibit I, can you tell which

11       account that is in reference to?

12  A.   Yes.  This would be for one --

13  Q.   Which account would that be?

14  A.   For 14700187.

15  Q.   Okay.  And so in reviewing these logs, what kind

16       of -- or in reviewing these account notes, what

17       kind of indication in these notes represent that

18       a phone call was placed by Med-1?

19  A.   All right.  I'm not sure what page this would be,

20       but the first column would be the account note

21       line, so middle way of the -- of the exhibit,

22       line 337, 338, 339, would be from a user of J5B,

23       would notate the attempt to -- to make a phone

24       call and a contact code of pick up/hang up that

25       would have been placed in there.

1    Q.    Now, how would a voicemail drop that was placed

2          by VoApps be outlined in these account notes?

3    A.    Okay.  So on the following page, lines 357

4          through 363, there would be a -- a system note.

5          The first two lines, 357, 358, would show the

6          account being loaded in as an account going to

7          VoApps today, you would see the letters, V -- V

8          stamp in those two, and then lines 359 through

9          363 would display the results that were provided

10         back, and you would see the letters, lower case,

11         voapmeb, in those lines.

12   Q.    Okay.  Now, if you could please turn back to the

13         first page of Exhibit I.

14   A.    Okay.

15   Q.    At the bottom of the page, I would say -- well,

16         in the number -- column number 26 --

17   A.    Yes.

18   Q.    -- what does that line mean?

19   A.    That line is the automated system move, that it

20         would have changed the account status or

21         disposition to that 3-CEL, 3 C-E-L, through an

22         automated tactic called 3-CEL move, and actually,

23         a couple lines above that where it would say RP

24         phone flag changed from blank to C, so it would

25         be looking for all phone numbers on the account

| 1 | | that had -- you know, with the -- with the C, if |
|---|---|---|
| 2 | | all -- all phone numbers on that account had a C, |
| 3 | | it would move to the 3-CEL disposition. |
| 4 | Q. | Okay.  Give me one second.  Now if you could flip |
| 5 | | to the page of Exhibit I where it's No. 499. |
| 6 | A. | Okay. |
| 7 | Q. | What does that line mean? |
| 8 | A. | 3 SKP on the -- right beside the 499, SMA |
| 9 | | would have been an agent or collector here who |
| 10 | | manually transferred the account disposition to a |
| 11 | | three skip or three -- to initiate a skiptrace. |
| 12 | Q. | Okay.  And by skiptrace, what do you mean? |
| 13 | A. | That would be it would automatically go to our |
| 14 | | skiptrace vendor to search for either an address |
| 15 | | and/or a phone number. |
| 16 | Q. | Okay.  And who is Med-1s skiptrace vendor? |
| 17 | A. | LexisNexis. |
| 18 | Q. | So basically, that 499 entry reflects that Med-1 |
| 19 | | ran a skiptrace on Ms. Wilkins? |
| 20 | A. | That would have been to initiate the skiptrace. |
| 21 | Q. | Okay.  And then turning to the next page, if we |
| 22 | | look at line 521 -- |
| 23 | A. | Okay. |
| 24 | Q. | -- again, what does this line mean? |
| 25 | A. | So the 3 LEX is going to be the -- the previous |

1       question, the previous line, the 3 SKP would be a

2       manual, or if the system automatically figured

3       out that it needed to go for a skiptrace, once

4       it's actually sent to LexisNexis, the system

5       moves it to this 3 LEX disposition, and it's --

6       it's either awaiting a response or it's gotten a

7       response at that point.

8   Q.  Okay.  And then now if we look down to line

9       531 --

10  A.  Yes.

11  Q.  -- of that same page, what does that line mean?

12  A.  That would have been part of the results file

13      back in -- and that would be lines starting at

14      522, they kind of all go together, the note would

15      say one or more new phone numbers were received.

16  Q.  Okay.  So based on the dates associated with

17      those three entries that I just directed you to,

18      sometime on or about January 17th 18th, or 19th,

19      Med-1 ran a skiptrace on Ms. Wilkins; is that

20      correct?

21  A.  That's correct, yes.

22  Q.  Okay.  And based on your reading of Exhibit I, is

23      there any indication as to what the results of

24      that skiptrace were?  In other words, what were

25      the new phone numbers that were found as provided

1        in line 531?

2   A.   It doesn't -- yeah, it doesn't stamp the phone --

3        it doesn't look like it stamps the actual phone

4        number in those notes.

5   Q.   Okay.  But again, around the January 17th, 18th,

6        19th time, the skiptrace was run that resulted in

7        receiving new phone numbers regarding Ms.

8        Wilkins?

9   A.   That is correct, yes.

10  Q.   Now, if you could keep Exhibit I out for

11       reference and then turn to Exhibit J --

12  A.   Okay.

13  Q.   Again, we'll look this one, it's going to be No.

14       561?

15  A.   561?

16  Q.   Yes.

17  A.   Okay.

18  Q.   You can also go ahead and look at entry 587 and

19       entry 601, as well.  Let me know when you've had

20       a chance to look at those.

21  A.   Okay.

22  Q.   And is this sort of -- essentially the same thing

23       that was outlined on account 14700187 where

24       sometime between January 17th and January 19th of

25       2017, Med-1 ran a skiptrace on Ms. Wilkins that

1          resulted in receiving these phone numbers?

2    A.    That is correct.  If the accounts are tied

3          together, then the notes would stamp in to each

4          of the accounts.

5    Q.    Okay.  And again -- I'm sorry, not again, but for

6          Exhibit J, based on your review of this -- these

7          account notes, do these account notes reference

8          account No. 15368863?

9    A.    Yes.

10   Q.    Okay.  Now, if you could pull back out Exhibit C,

11         and look at again Interrogatory No. 3.

12   A.    Okay.

13   Q.    On 1/17/2017, if you notice, all of the entries

14         prior to that date where that table outlines the

15         phone number called, what phone number was

16         called?

17   A.    That would be the number ending in 4629.

18   Q.    Okay.  And after January 17, what phone number

19         was primarily called?

20   A.    That would be the phone number ending in 7737.

21   Q.    Okay.  Based on the nature of Med-1's skiptrace,

22         based on the nature of the response to

23         Interrogatory No. 3, is it safe to say that the

24         317-400-7737 phone number was the new phone

25         number which was gathered via the skiptrace that

1          was run on Ms. Wilkins?

2   A.   I would say that's -- that's easy to assume, yes.

3   Q.   Okay.  So what are Med-1's policies and

4          procedures as it relates to skip-tracing

5          consumer's phone numbers?

6   A.   In -- if we have an account that has either no

7          address or if we get return mail, it will

8          initiate automatically an address search

9          skiptrace.  If we have an account that ends up

10         having no phone numbers on the account, it will

11         initiate an automatic skiptrace entry, as well.

12             And then manually, if an agent or anyone

13         that's in the account and -- you know, gets told

14         that, hey, you have the wrong number and we

15         remove it and there is no other phone numbers,

16         then that agent or collector can manually

17         initiate the skiptrace, as well.

18  Q.   Okay.  And in this instance, I believe you

19         testified it was an agent that initiated the

20         skiptrace?

21  A.   Correct, yes.

22  Q.   And do you know why that agent or -- initiated

23         the skiptrace?

24  A.   On the -- on the account that she was calling,

25         she removed the phone number based on the note

1        stating that she was told that we had the wrong

2        phone number which left that account with no

3        phone numbers.

4    Q.  Okay.  So assuming that the 7737 number was

5        provided to CHN, and by extension, Med-1, why was

6        it necessary to run a skiptrace on Ms. Wilkins

7        rather than simply look at the other phone

8        numbers that may be associated with her account?

9    A.  That's a good question.  I don't have a good

10       answer for you on that one.  That was -- that's

11       what should have happened, if we had -- if we had

12       phone numbers in the other accounts, the agent

13       should look at all accounts to see any other

14       phone numbers, rather than just initiating a

15       skiptrace.

16   Q.  So it is Med-1's policies and procedures that if

17       it has alternate phone numbers to call a consumer

18       at, those would be the first numbers to look to

19       rather than running a skiptrace?

20   A.  Yes.

21   Q.  So it's -- so can we assume or is it safe to say

22       that Med-1 was not aware that it had this phone

23       number ending in 7737 at the time it decided to

24       run a skiptrace?

25   A.  I would say that that's definitely safe to assume

1         for the agent that was -- that initiated it, and

2         then at the time of that skiptrace, the only

3         account that would be reviewed for phone numbers

4         would have been that seed account.  So if that

5         number was in account two, three, or 34, the

6         skiptrace process wouldn't have picked that up.

7    Q.   Okay.  And so again, that 7737 phone number was

8         not provided in connection with Med-1 account No.

9         14700187 and that is why it was not recognized?

10   A.   Correct, yes.  So it -- it would not have been

11        listed on that seed account.  Presently, current

12        day, if we have the same situation happen and we

13        run out of phone numbers, our system will find a

14        phone number that's in account 12 and mirror that

15        up to the main seed account number.  In January

16        of 2017, it did not work that way.

17   Q.   Understood, okay.  So as it presently stands,

18        Med-1 would not have needed to skiptrace

19        plaintiff's number, it would have linked to the

20        other accounts linked with the seed account and

21        then adjusted accordingly?

22   A.   Yeah, it would have actually kicked her out, it

23        would have stopped her from -- when she tried to

24        put it into the skiptrace 3 SKP disposition, it

25        would have given her an error message.

```
 1              Now, it would have been up to her to either

 2         figure out why it gave her the error message or

 3         find somebody that could give her that answer,

 4         but it would either give her an error message or

 5         automatically move that phone number up to the

 6         top.

 7    Q.   Okay.  All right.  You can set aside Exhibit C.

 8         If you would, keep Exhibit I and J out, but you

 9         just need to have those open to the first page.

10    A.   I'm sorry, I had to cough.  Open to the first?

11    Q.   Yeah, yes, Exhibit I and J open to the first

12         page, and also pull out Exhibit K.

13    A.   Okay.

14    Q.   All right.  So look at the first page of these

15         documents.  If we look at sort of the top entry

16         in each, you'll notice Exhibit I begins with No.

17         1, Exhibit -- sorry.  Yeah, Exhibit I begins with

18         No. 1, Exhibit J begins with No. 1, yet Exhibit K

19         begins with No. 214.  Do you have any idea why

20         Exhibit J begins with No. 214?

21    A.   I do not.

22    Q.   So presumably, there are other portions of these

23         account notes which would precede No. 214?

24    A.   Yes.

25    Q.   Okay, all right.  You can put those three
```

1       exhibits back.  And if could you please pull back

2       out Exhibit C and also refer to Exhibit L.

3   A.  Okay.  And just moving back to K, if you need

4       those 1 through 213 notes, we can get those to

5       you, as well.

6   Q.  Okay.  Yeah, we'll be asking for those.

7   A.  Okay.

8   Q.  So we've already gone over Exhibit C extensively.

9       In reference to Exhibit L, do you know what this

10      document is?

11  A.  It's my understanding, these are the -- your

12      client's phone -- cell phone records.

13  Q.  Yes.  Now, have you seen this document before?

14  A.  Yeah, I mean, briefly.

15  Q.  Okay.  Now, looking back at Exhibit C, if we look

16      at the entry towards the bottom for March 30,

17      2017 --

18  A.  Okay.

19  Q.  -- is that the type of call outlined in Med-1's

20      response to interrogatory, suggests that that

21      phone call was placed via VoApps; is that

22      correct?

23  A.  That is correct, yes.

24  Q.  Now, turning back to Exhibit L, you can go to

25      page 265 as outlined in the bottom right-hand

1        corner.

2   A.   Okay.

3   Q.   And look at roughly -- actually, it's not

4        roughly.   Look four lines from the bottom.

5   A.   Okay.

6   Q.   Now, looking at that four lines from the bottom,

7        there is an incoming -- or the nature of that

8        call is referred to as incoming; correct?

9   A.   Correct.

10  Q.   And the phone number from which that call was

11       dialed, it's outlined as 1-877-286-7421; correct?

12  A.   That is correct, yes.

13  Q.   Now, that is the number associated with VoApps

14       direct voicemail drops; that is correct?

15  A.   Correct, specific to Med-1, yes.

16  Q.   Okay.   So even when a phone call is placed or a

17       direct voicemail drop is placed by VoApps, that

18       gets reflected as an incoming call on Ms.

19       Wilkins' phone records; is that correct?

20  A.   It appears so, yes.

21                  MR. COLEMAN:   Okay.   Thank you for

22       your time, Mr. Jude.   That is all the questions

23       that I have for you.

24                  THE WITNESS:   Sounds good.   Thank

25       you.

```
 1

 2                   MR. MOLINE:  Eric, if I may, can I

 3        ask a follow-up question?

 4                   MR. COLEMAN:  Yes, go ahead.

 5                   MR. MOLINE:  Thank you.

 6                   MR. COLEMAN:  I reserve the right to

 7        ask a subsequent follow-up, as well.

 8                   MR. MOLINE:  Of course, no problem.

 9

10        CROSS-EXAMINATION,

11             QUESTIONS BY MR. NICHOLAS D. MOLINE:

12   Q.   Mike, in your testimony, you spoke a little bit

13        about 3-CEL, that disposition, and whether or not

14        it reflects if consent had been provided.  When

15        an account was placed into 3-CEL, is that a

16        determinative factor that there is no consent, or

17        are there cases where consent is provided and it

18        is still in 3-CEL?

19   A.   There could be cases of that, yes.  If in -- so

20        if we have three, four, 12 accounts all

21        route-tied together and consent would have been

22        given on the fifth account, at that time, it

23        would have only looked at the information on

24        account number one to determine the -- the

25        disposition.  So even though we may have had
```

 1          consent, if it didn't get updated on account one,

 2          then it would leave it in that 3-CEL disposition.

 3    Q.    Is 3-CEL used for home phone numbers?

 4    A.    No.

 5                    MR. MOLINE:  That is -- those are my

 6          only questions, Eric.  If you have any follow-up,

 7          go ahead.

 8                    MR. COLEMAN:  Yeah.

 9

10          REDIRECT EXAMINATION,

11              QUESTIONS BY MR. COLEMAN:

12    Q.    Mr. Jude, if you could pull back out Exhibit I.

13    A.    You said I?

14    Q.    I, yes.

15    A.    Okay.

16    Q.    All right.  If you'd turn to line 531.

17    A.    Okay.

18    Q.    So we see line 531, we know that that was a

19          skiptrace that these phone numbers were received.

20          Now, if we look down at entry 533, what does that

21          line mean?

22    A.    So that line -- and we'll go ahead and just

23          discuss 532, as well, the -- Lexis found one new

24          phone number, so it would then transfer it to a

25          disposition of three new, and it immediately

1        would find out where that needs to go.

2        LexisNexis would have come back showing that that

3        was a cell phone, and LexisNexis would not look

4        for consent or anything on that account, so it

5        would have seen that it was a cell phone and it

6        would have placed it automatically into that

7        3-CEL disposition at that point.

8    Q.   Okay.  So then look at -- the next page is 560.

9        So does that line sort of mean the same thing as

10        the previous line?

11   A.   Correct, yes.

12   Q.   Okay.

13   A.   As far as the disposition, that exact line

14        specifically would have been part of that VoApps

15        result code from that -- that day.

16   Q.   Okay.  And then again, if we look at the next

17        page, 561, below that, so those entries indicate

18        a VoApps message; is that correct?

19   A.   Correct.  So lines 561 through 567 would have

20        been -- the V stamp on the first one would have

21        been sending the -- the account through to

22        VoApps, and then 562 through 566 -- or I'm sorry,

23        567 would have been part of the results from that

24        campaign.

25   Q.   And then so 567, we also see the 3-CEL notation,

1          so does that mean that VoApps dropped the direct

2          voicemail to a number that -- because it was

3          coded as 3-CEL, there was presumably no consent

4          to contact that number?

5    A.    That would have -- yes, that would have been

6          presumably what was going on at that -- on that

7          day.

8                       MR. COLEMAN:  Okay.  That's all I

9          have got.  Nicholas, do you have any follow-up?

10                      MR. MOLINE:  I do not, Eric.  Thank

11         you very much.

12                      THE WITNESS:  Thanks a lot.

13                      MR. COLEMAN:  Linda, hold off on

14         ordering it right now.  We'll get back in contact

15         if we need a copy.

16

17         (Ending time:  1:55 p.m.)

18

19

20

21

22

23

24

25

```
 1   STATE OF INDIANA   )
                        )
 2   COUNTY OF _____)

 3

 4       I, the undersigned, declare under penalty of

 5   perjury that I have read the foregoing

 6   transcript, and I have made any corrections,

 7   additions, or deletions that I was desirous of

 8   making; that the foregoing is a true and correct

 9   transcript of my testimony contained therein.

10

11           Executed this _____ day of _____,

12   20___, at the address of:

13

14

15

16

17

18                     _____

19                        Michael R. Jude

20

21

22

23

24

25
```

1                    REPORTER'S CERTIFICATE

2

3         I, LINDA C. CALLAHAN, a Court Reporter and
      Notary Public, certify;
4
          That the foregoing proceedings were taken
5     before me at the time and place therein set forth,
      at which time, the witness was put under oath by
6     me;

7         That the testimony of the witness, the
      questions propounded, and all objections and
8     statements made at the time of the examination
      were recorded stenographically by me and were
9     thereafter transcribed;

10        That the foregoing is a true and correct
      transcript of my shorthand notes so taken.
11
          I further certify that I am not a relative or
12    employee of any attorney of the parties, nor
      financially interested in the action.
13
          I declare under penalty of perjury under the
14    laws of Indiana that the foregoing is true and
      correct.
15

16        Dated this 31st day of August, 2018.

17

18

19
      _____
20                   LINDA C. CALLAHAN

21

22

23

      My county of residence:  Hamilton
24    My commission expires:  9/23/24

25

KRYTIERE CHANEL WILKINS vs MED-1 SOLUTIONS
Michael Jude June 20, 2018  30(b)(6)

**1**

**1**  66:17,18 67:4

**1-877-286-7421**  68:11

**1/17/2017**  62:13

**10**  23:24 54:1,4,5,7,8,9

**11**  33:11

**12**  65:14 69:20

**14**  23:24

**140**  49:20

**14700187**  34:7 40:5 45:11,17
47:17 49:20 53:12 55:10 56:21
57:14 61:23 65:9

**1470187**  54:16

**15**  21:11 25:8 53:25

**15368863**  46:5,9 47:18 54:17
55:10 62:8

**155368863**  53:12

**15563863**  51:2

**15985914**  46:19 47:4 51:3 53:16

**17**  38:19 45:14 49:15 62:18

**17-cv-01731**  3:22

**17th**  49:8 60:18 61:5,24

**18th**  60:18 61:5

**19**  49:25 50:14

**1990**  7:9

**1994**  7:16

**19th**  60:18 61:6,24

**1:55**  72:17

**2**

**2/24**  56:15

**2/24/2017**  56:12

**20**  73:12

**200**  28:23

**2016**  49:8,15

**2017**  34:10,11,15,16 61:25 65:16
67:17

**213**  67:4

**214**  66:19,20,23

**24th**  34:10,15

**2500**  3:16

**26**  58:16

**265**  67:25

**3**

**3**  33:15 34:11,14 37:18 56:10,20
58:21 59:8,25 60:1,5 62:11,23
65:24

**3-CEL**  37:18,21,22,23 58:21,22
59:3 69:13,15,18 70:2,3 71:7,25
72:3

**3/3/17**  56:15

**3/3/2017**  56:12

**30**  3:11 67:16

**31**  3:18 10:11

**317-400-7737**  47:2 62:24

**317-992-4629**  45:21 46:11 47:1

**337**  57:22

**338**  57:22

**339**  57:22

**34**  65:5

**357**  58:3,5

**358**  58:5

**359**  58:8

**363**  58:4,9

**3rd**  34:16

**4**

**46**  6:16

**46142**  10:12

**4629**  53:13 54:18 62:17

**499**  59:5,8,18

**5**

**50**  10:9

**517**  3:18 10:11

**521**  59:22

**522**  60:14

**531**  60:9 61:1 70:16,18

**532**  70:23

**533**  70:20

**560**  71:8

**561**  61:14,15 71:17,19

**562**  71:22

**566**  71:22

**567**  71:19,23,25

**587**  61:18

**6**

**601**  61:19

**7**

**7737**  47:5,12,16 53:18 54:24
55:9 62:20 64:4,23 65:7

**8**

**8**  31:1,15

**85**  13:12

**888-323-0881**  38:13

**9**

**90401575323**  45:9

**90401636213**  46:3

**90401721672**  46:18

**A**

**ability**  6:24

**able**  13:12 17:1 39:23

**about**  6:11 8:19 9:1,3 10:9 11:1
13:9 15:7 16:25 17:15 21:20
23:3,20,21,23 27:21 28:2,13
35:20 36:1 37:4,21 41:15 43:18
51:11,15 52:8 53:21,25 55:19

KRYTIERE CHANEL WILKINS vs MED-1 SOLUTIONS
Michael Jude June 20, 2018  30(b)(6)

Job 28336
Index: above..attempt

60:18 69:13

**above** 58:23

**Absolutely** 36:4

**ACA** 13:7

**accordingly** 65:21

**account** 18:25 19:11 21:24 22:20,22,23 23:9,20 26:1,6,13 28:11 34:4,7 36:10,22 37:10,25 39:17,19 40:5,7,9,16,20,22,23 41:8,10,14,22,23 42:4,7,14,18, 23,25 43:1,2,20,23 44:4,9,10,11, 12 45:9,11,17,20 46:3,4,9,14,18, 19 47:3,4,17,18,23 48:1,20 49:20 53:16 54:16 56:21 57:7,11,13,16, 20 58:2,6,20,25 59:2,10 61:23 62:7,8 63:6,9,10,13,24 64:2,8 65:3,4,5,8,11,14,15,20 66:23 69:15,22,24 70:1 71:4,21

**accounting** 7:18 44:5

**accounts** 21:19 22:2,17 23:17 24:1 25:1 28:25 32:6 36:7 37:16 39:1,5,13,23,25 40:4,13,18 41:16,18 42:10 43:3,6,7,8,13,15, 19,21 47:23 48:2,6,11,17,22 51:2 53:12 54:22,25 55:11 62:2,4 64:12,13 65:20 69:20

**Act** 12:4 13:6 14:19 15:6

**acts** 14:13

**actual** 12:8 36:18 61:3

**actually** 33:13 47:20 58:22 60:4 65:22 68:3

**additional** 18:23

**additions** 73:7

**address** 33:22 41:24 59:14 63:7, 8 73:12

**adjusted** 65:21

**admission** 31:1,15,19

**admissions** 19:10 30:14

**admit** 31:5,8,10

**after** 7:19 22:20,22 23:3,20 40:15,19 41:12 62:18

**again** 34:24 42:19 45:25 46:4,7, 12,17 54:15 55:2,9 56:20 59:24 61:5,13 62:5,11 65:7 71:16

**against** 17:3,25 40:14

**agent** 38:24 59:9 63:12,16,19,22 64:12 65:1

**agents** 51:21 52:5,20 53:5,8

**ago** 4:16 17:16 19:24

**agreement** 3:14 49:19 50:7,13 51:25 55:4

**agreements** 51:2

**ahead** 32:22 45:24 47:20 56:23 61:18 69:4 70:7,22

**alcohol** 6:18

**Allie** 16:9

**allow** 52:5

**allows** 52:20

**already** 9:16,17 15:9 18:5 41:1 67:8

**also** 5:22 6:5 11:3 14:17 21:7 26:18 29:3,23 35:7 41:20 47:1 48:9 50:18 61:18 66:12 67:2 71:25

**altered** 28:12

**alternate** 64:17

**although** 44:14

**American** 13:7

**amount** 37:10

**amounts** 51:23

**analyzing** 9:23

**and/or** 59:15

**annual** 13:18,24

**another** 5:25 40:15 41:13 42:25

**answer** 6:10 9:18 20:21 28:23 31:3,8 35:24 36:23 55:5 64:10 66:3

**answered** 9:17

**answering** 10:2

**answers** 30:19

**anticipate** 20:12

**any** 5:2,14,16 6:11,18,20 7:10, 19,22,24 8:1,3,7 9:2 11:15 13:14, 17 14:12,19,23 15:1,5,18 16:5,12 17:11,24 18:20 19:5 20:15 23:17 25:2,17,20,21 26:16,20 27:21 28:5 29:3,16 31:7,24 34:25 42:12

43:24 44:7 45:22 46:12 48:5 51:23 60:23 64:13 66:19 70:6 72:9 73:6

**anybody** 18:6

**anyone** 8:9,11 19:2 63:12

**anything** 4:9 5:20 6:11,23 13:18 18:23 26:22 35:11 52:8 71:4

**anyway** 52:25

**anywhere** 41:25

**appear** 45:23 46:15

**appears** 47:9 68:20

**applied** 43:24 44:3

**applies** 53:7

**apply** 43:19 44:7 52:10

**approximately** 10:8 17:13

**are** 5:8,9 6:15,17,20 9:14 10:21 11:3 15:4 16:5,15 19:18 20:4,7, 15 21:14,16,22 22:3 24:5,8 25:20,21 26:20,22 30:1,4,16 32:14 33:4 37:17 38:3 39:8 43:15 44:19 48:3,5 49:1 50:19 55:21 57:2,5 62:2 63:3 66:22 67:11 69:17 70:5

**around** 20:13 61:5

**arrested** 8:5

**aside** 5:5 20:16 26:20 28:5 32:23 41:7 44:13 56:24 66:7

**ask** 5:9,16,21 19:12 30:7 55:23 69:3,7

**asked** 48:20

**asking** 5:23 6:6 10:17 41:11 52:13 67:6

**asks** 31:18

**aspect** 20:14

**assist** 18:17

**associated** 34:4 45:16 46:8 49:14 60:16 64:8 68:13

**Association** 13:7

**assume** 63:2 64:21,25

**assuming** 64:4

**attempt** 35:9 38:12 57:23

KRYTIERE CHANEL WILKINS vs MED-1 SOLUTIONS
Michael Jude June 20, 2018  30(b)(6)

Job 28336
Index: attempting..Chanel

**attempting** 35:21 38:4

**attend** 7:10

**attention** 17:17

**attorney** 6:5 16:1,3 17:18 18:14

**attorneys** 18:13,22 23:19

**authorize** 51:21

**auto** 38:1

**autodial** 35:19 37:19

**autodialer** 29:4 31:25 51:22 52:6 56:6,17

**autodialers** 52:22

**automated** 12:16 23:1 32:16 35:12 55:25 58:19,22

**automatic** 12:24 35:2 63:11

**automatically** 21:25 23:14,16 39:20 42:1 43:10,25 59:13 60:2 63:8 66:5 71:6

**Avenue** 3:16

**awaiting** 60:6

**aware** 16:15 17:4,10 24:8 28:8 57:5 64:22

**B**

**back** 11:11 27:16 28:10,20 36:21 38:18 44:14 45:14 47:20,21 49:10,22 54:9 56:9 58:10,12 60:13 62:10 67:1,3,15,24 70:12 71:2 72:14

**balance** 26:5 39:15

**bankruptcies** 23:2

**bankruptcy** 23:10 26:17

**based** 12:11 13:23 20:2 31:9 36:7 39:11 50:24 52:3,18 53:1 54:20 55:3,14 57:9 60:16,22 62:6,21,22 63:25

**bases** 50:15

**basically** 42:3 43:5 59:18

**because** 32:2 40:9 42:4 56:5 72:2

**become** 17:4

**becomes** 21:24

**been** 3:2 4:1,9 5:7 8:3,5,7,11,18, 19 9:7 14:22 16:11,16 19:9,13 21:9 24:10 25:6,7,8,9,18 27:8 35:1 40:6,8 41:1 42:16 53:21 55:16 56:18 57:25 59:9,20 60:12 65:4,10 66:1 69:14,21 71:14,20, 21,23 72:5

**before** 4:2 5:8,17,24 6:7 8:9,20 19:20,25 30:20 33:5,8 44:20 49:3 67:13

**began** 13:4 41:9 43:2

**begin** 23:22

**begins** 43:7 66:16,17,18,19,20

**being** 3:13 4:10 58:6

**believe** 3:17 4:5 15:9 18:5 23:12 29:10 45:8 48:3 52:20 63:18

**below** 34:2 71:17

**beside** 59:8

**besides** 17:21

**best** 6:3 14:5 26:24

**between** 5:20 21:8 22:13 61:24

**billing** 21:23 26:8

**bills** 21:2

**bit** 11:12 28:20 42:23 69:12

**bits** 25:24

**blank** 58:24

**blanks** 25:12

**bold** 51:10

**both** 5:25 30:5 37:11 50:25

**bottom** 58:15 67:16,25 68:4,6

**boy** 30:9,10

**break** 5:14,17,20,22 53:22

**briefly** 15:6 67:14

**broad** 14:5

**brought** 17:17

**built** 37:14

**business** 7:18 16:8 21:10

**C**

**C-E-L** 37:18 58:21

**call** 11:10,11 12:18,23 23:7 28:15 32:1,3,8 34:13,21 35:7,10, 21 36:7 37:8,15,18,23 38:12 40:6 42:10,11 47:25 48:1,4,20 51:21 54:23 55:24 56:6 57:18,24 64:17 67:19,21 68:8,10,16,18

**callback** 32:5

**called** 17:19 27:5 47:24 50:5 58:22 62:15,16,19

**calling** 14:12 39:24 63:24

**calls** 9:7,8 11:8 12:15 25:20 28:24 29:1,6,8 30:3 31:5,11,19 32:11,14,16,19 33:20 34:5,10,15, 24,25 35:1,4 39:16 43:17 48:21 52:6,21 53:4 56:13

**came** 41:23 42:18

**campaign** 36:20 37:1 71:24

**can** 5:21 6:3 11:17 12:18,22 18:20 20:18 21:18 25:10 32:22 35:24 36:1,12 39:3 43:4 44:13 45:14,24 50:10 51:1 54:4,7 55:5 56:23 57:10 61:18 63:16 64:21 66:7,25 67:4,24 69:2

**can't** 5:24 26:22

**capacity** 4:6,19 8:12

**care** 21:7

**case** 3:20,22 4:21,22,24 16:19 18:16 19:2 24:4 40:3 58:10

**cases** 4:12 69:17,19

**cause** 52:5

**cease** 41:3,12,19 48:22

**cease-and-desist** 41:11,13,17 42:5

**cell** 12:15 23:2 26:19 27:1,11,17, 25 35:15,16,19 37:12,19 38:1 51:20,22 52:1,21 55:22 67:12 71:3,5

**cellular** 12:18,23 31:6 33:20 38:23 50:5

**center** 35:7

**certain** 14:11 32:6

**certifications** 8:1

**chance** 61:20

**Chanel** 3:21

KRYTIERE CHANEL WILKINS vs MED-1 SOLUTIONS
Michael Jude June 20, 2018  30(b)(6)

Job 28336
Index: change..Credit

**change** 42:22

**changed** 28:12,18 41:19 58:20, 24

**changes** 28:14

**charged** 8:7

**check** 23:1

**checking** 5:19

**checks** 26:25

**CHN** 22:6,9,13,16,21,22 23:15, 21 24:6,8,13,18,20 26:2,14 27:1, 11,22 45:4,5,9,19 46:1,3,10,18, 25 47:8,11,12 48:19 52:4,5,20 53:5,8 54:13,15 55:16,17 64:5

**Civil** 3:12

**class** 12:8

**classroom** 11:20,21 15:12

**clause** 52:3,10,20 53:2,3,7

**client** 21:7 25:18 26:2,14 28:7 39:11,19,20 43:9,11 48:14

**client's** 67:12

**clients** 21:4,22 22:10 24:13 29:1 48:10

**close** 19:24

**code** 57:24 71:15

**coded** 72:3

**codes** 25:17

**Coleman** 3:8,9,15 5:12 52:16 53:20,25 54:6,8 55:8 68:21 69:4, 6 70:8,11 72:8,13

**collect** 21:12 35:22 38:4,12 42:3 51:23

**collecting** 21:20 24:1 28:25 30:4 39:9 40:13 41:16 42:23,25 43:2,7

**collection** 9:8,15 10:19 13:6,7 14:3 15:1 17:9 21:5 22:11,18,23, 25 25:5 29:9 30:3 36:6 38:24 40:18,24,25 41:9,12 43:1 48:21

**collections** 8:17 10:23,24,25 11:4 21:10 29:25 30:5

**collector** 9:3 21:1 29:20 59:9 63:16

**college** 7:10,12,13,19,24

**column** 34:13 35:11 57:20 58:16

**come** 20:20 24:14,16 27:16 71:2

**comes** 26:13 28:7

**comfortable** 20:7,15

**coming** 38:15 44:14 48:18

**communication** 21:8 41:4,19

**Community** 22:3,10 23:17 24:4 48:9,13 51:20,21

**company** 11:21 12:18,23 27:5 35:5

**complete** 15:18

**completed** 36:20

**compliance** 11:21,25 12:1 13:3, 18,20 14:17

**conclusion** 52:14 55:2,6

**conduct** 16:12

**conferences** 13:17

**confirm** 29:11

**connection** 65:8

**consent** 12:16,20,25 28:16,17 31:25 32:3 34:21 35:19 37:20 38:1 49:18 50:5,7,9,12,15 51:1, 24 52:1,10,25 53:7 54:13,20,23 55:4,13,23,24 56:5,16 69:14,16, 17,21 70:1 71:4 72:3

**considered** 53:5

**consistent** 13:5

**consumer** 12:4 23:22 35:9,21 37:8 39:10,13 40:14,17 41:8,10, 15 42:24 43:5,16 47:24 48:6,19 55:14,20 56:3 64:17

**consumer's** 12:20,23,25 31:23 63:5

**consumers** 9:8 11:8 14:18 21:12 23:13 24:1 28:24 29:12,14 30:4 32:19 38:3

**consumers'** 38:7

**contact** 18:6 35:8,18 50:15 52:1 55:14 56:16 57:24 72:4,14

**contacting** 23:22,23 41:9

**Contacts** 35:6

**contained** 73:9

**contract** 52:14

**contractors** 25:16

**contracts** 55:4

**control** 38:2

**conversation** 55:18,20

**conversations** 25:21

**convicted** 8:3

**copied** 42:21

**copy** 42:12 72:15

**copying** 42:15

**corner** 68:1

**corporate** 8:24 20:3

**correct** 5:6 10:6,7 11:5 15:11,12 22:18,19 26:12 28:4 29:7 32:11, 12 34:22 35:3 37:6 38:16 39:6,7 40:2,6,11 43:3 44:10 45:12,13 46:5,20 47:5,6,19 48:2 49:8 53:14,18,19 54:18,19 55:11,12, 16 56:7,8,13,14,22 60:20,21 61:9 62:2 63:21 65:10 67:22,23 68:8, 9,11,12,14,15,19 71:11,18,19 73:8

**corrections** 73:6

**correctly** 36:25

**cough** 66:10

**could** 9:16,18 30:25 32:23 33:10,13,17 36:2 37:11 38:9,17, 18 44:17 48:24 49:4,22 50:2,20 51:5,19 53:23 56:9,24 58:12 59:4 61:10 62:10 66:3 67:1 69:19 70:12

**counsel** 3:15

**counts** 39:9

**COUNTY** 73:2

**couple** 4:16 58:23

**course** 13:9,10 15:10,20 28:15 69:8

**cover** 53:3

**covered** 12:1 15:4

**create** 38:5

**Credit** 15:6

KRYTIERE CHANEL WILKINS vs MED-1 SOLUTIONS                          Job 28336
Michael Jude June 20, 2018  30(b)(6)                        Index: creditor..during

**creditor** 48:19

**crimes** 8:7

**criteria** 36:8 37:14

**CROSS-EXAMINATION** 69:10

**CSV** 24:17

**current** 8:15 9:10,20 10:5 12:10, 12 15:24 16:8 41:21 42:10 65:11

**currently** 6:17,20 27:6

**customer** 11:22 56:2

**customer's** 12:18

**cut** 14:14

---

**D**

**daily** 9:13

**data** 24:12,14,18,23 25:25 26:7, 14,15,21 27:4 28:7 36:1 42:9

**database** 22:24

**date** 19:23 26:5 33:19,24 49:12, 15 50:24 53:15 62:14

**dates** 27:7 39:2 50:20 60:16

**day** 9:19,21,23,24,25 36:19 65:12 71:15 72:7 73:11

**day's** 36:7

**days** 23:4,24

**deal** 46:17

**death** 23:2

**debt** 13:5 14:3 21:1,5 29:9,20 38:12

**deceased** 26:17

**deceptive** 14:13,18

**decided** 64:23

**declare** 73:4

**deemed** 23:6

**defendant** 4:13 38:24 39:2 50:8

**defendant's** 20:14 30:13 33:1

**defendants** 3:17 19:15

**definitely** 64:25

**deletions** 73:7

**delinquent** 21:24 22:16

**demographic** 25:15 26:5,10 46:22 47:13

**demographics** 45:1

**department** 9:4,5 10:19,20,21, 24 11:1,4 18:3,7,13 21:7,23 24:25 25:2 30:1,2 32:7 44:5

**departments** 10:16,22 30:6

**depend** 39:18

**depending** 17:7

**depends** 40:20

**deposed** 4:1,9,12,15 5:7

**deposition** 3:10,13,19 5:1 18:24 19:6,14 20:21

**depositions** 5:9 17:22

**describe** 9:11 22:12 37:24

**designate** 37:19

**designated** 3:17 20:3 30:2 44:8

**designation** 47:11

**designed** 12:14 14:2

**desirous** 73:7

**determinative** 69:16

**determine** 23:4 27:10 51:1 69:24

**determines** 37:7,8

**determining** 43:18

**development** 16:8

**dial** 31:22,24 32:9,10,13 34:17 37:12 38:1 56:2

**dialed** 31:7,12,17,20 32:20 34:19,20,25 35:1 56:4,5,13 68:11

**dialer** 12:16 55:25

**dialing** 12:24 20:14 32:17 35:15

**dials** 29:3 35:8

**did** 7:3,8,10,11,15,17,19 8:20 9:17 11:14 13:4 15:9 17:13 18:17,19,22 19:22 27:18,21 28:5 29:18 30:18 32:2 33:6 45:22 46:12 47:10,15 56:16 65:16

**didn't** 12:7 14:14 70:1

**different** 8:20 10:16,21 39:19 43:11,13 48:14 50:20

**direct** 3:7 10:1 18:6,10 35:14 37:5 68:14,17 72:1

**directed** 60:17

**directly** 9:14 29:2,5 32:19

**director** 16:9

**discharge** 45:1,17,19 46:9,13, 24 49:12,15 53:11

**discharged** 45:5

**disconnected** 36:24

**discovery** 18:17 19:10

**discuss** 70:23

**discussed** 19:2

**discussing** 20:16 54:12

**discussion** 20:13

**display** 58:9

**disposition** 25:16 37:16,23 41:5 58:21 59:3,10 60:5 65:24 69:13, 25 70:2,25 71:7,13

**District** 3:20

**do-not-call** 41:21,25 42:2,12

**do-not-contact** 41:3

**doctor's** 26:8

**document** 19:20 20:2 30:16,18, 20 31:1 32:25 33:4,6,8,10 38:19 44:19,25 45:8 46:16,18 47:10 49:2,5,7,14,18 50:12,19 57:3,5,9 67:10,13

**documented** 25:22

**documents** 17:12,23 19:5,8 25:21 50:21 54:13,21 66:15

**down** 51:12,16 60:8 70:20

**drop** 35:12 58:1 68:17

**dropped** 72:1

**drops** 37:3,5 68:14

**drugs** 6:18

**due** 21:24

**duly** 3:2

**during** 16:10 27:7 28:15 31:6 33:21

---

**E**

---

**e-mailed** 17:19

**earlier** 28:3 29:11 34:18 47:22 56:1

**easier** 5:23

**easy** 63:2

**effort** 48:21

**efforts** 40:18 41:12

**eight** 25:8

**either** 10:2 17:19 27:17 47:17 51:6,22 54:25 55:10,17 59:14 60:6 63:6 66:1,4

**electronically** 24:21

**eliminate** 14:2

**employ** 29:4

**employee** 33:23,24 55:15

**employees** 10:5,8 11:3 13:21 28:21

**employment** 8:14 9:6 16:10 52:19 53:3

**end** 21:25 22:21 36:19 37:11

**ending** 47:12,16 53:13,17 54:18 62:17,20 64:23 72:17

**ends** 63:9

**engage** 11:15

**engages** 13:25

**enough** 54:5

**entities** 53:4

**entries** 60:17 62:13 71:17

**entry** 59:18 61:18,19 63:11 66:15 67:16 70:20

**Eric** 3:8,15 52:13 54:4 55:1 69:2 70:6 72:10

**error** 65:25 66:2,4

**escalated** 11:10

**essentially** 37:1 43:3 47:24 61:22

**established** 54:21

**establishing** 55:19

**even** 5:12 31:18 41:1 43:11 48:11 68:16 69:25

**ever** 4:1 5:2 8:5,7,9,11 9:7 16:11 29:16

**every** 5:19 26:6

**everyone** 3:10

**exact** 71:13

**exactly** 27:15 35:13

**EXAMINATION** 3:7 70:10

**examined** 3:5

**Excel** 24:17,18

**Except** 46:3

**excuse** 13:8

**Executed** 73:11

**exhibit** 19:13 30:8 32:22,23,24 38:18 44:13,17 45:25 48:24 49:10,14,16,18,23 50:12,19,25 51:1,6 56:9,24,25 57:10,21 58:13 59:5 60:22 61:10,11 62:6,10 66:7,8,11,12,16,17,18,20 67:2,8,9,15,24 70:12

**exhibits** 19:11 50:18 54:21 67:1

**existence** 25:9

**existing** 41:17 42:8

**explain** 25:10

**export** 36:22

**express** 55:24

**extension** 21:23 64:5

**extensively** 67:8

**extent** 9:16,17 31:22

---

**F**

---

**F-A-C-S** 25:4

**facilitates** 21:8

**FACS** 25:4,6,10 26:15 36:6 57:7

**fact** 27:1 55:7

**factor** 69:16

**Fair** 13:5 15:6

**fall** 30:5

**familiar** 5:8,9 22:3 24:5 30:16 33:4 44:19 49:1 57:3

**FDCPA** 12:2 13:2,14 14:1,7 15:1,4 16:17 29:21

**February** 34:10,15

**Federal** 3:12

**feel** 5:21 20:17

**felonies** 8:3

**fields** 25:14

**fifth** 69:22

**figure** 66:2

**figured** 60:2

**file** 24:17,18,25 36:11,21 38:5 60:12

**filed** 17:3,25 40:14,15,17,19 41:1

**fill** 25:12

**filters** 26:16

**financial** 26:9

**find** 28:15,16 39:12 65:13 66:3 71:1

**fine** 14:16 20:12 54:3

**finish** 5:23

**finished** 36:17

**first** 3:2 11:14 15:8,13,15 17:13 19:22 23:24 30:12 33:1 40:9 41:6 43:25 44:9,10,12 47:7 57:20 58:5,13 64:18 66:9,10,11,14 71:20

**five** 16:23,24 20:5 33:10

**flag** 42:11,12,15,21 58:24

**flagged** 21:24 42:1

**Flash-player-style** 13:8

**flip** 19:17 59:4

**floor** 8:17 9:15

**follow-up** 69:3,7 70:6 72:9

**following** 39:2 58:3

**follows** 3:5

**foregoing** 73:5,8

**format** 24:13

---

**forward**  13:12 22:7

**found**  60:25 70:23

**four**  4:5 5:4,5 9:1 35:4 43:21 44:24 46:16 68:4,6 69:20

**fourth**  44:1

**Francis**  16:1 18:10,14

**free**  5:15,21

**FTP**  24:16

**full**  5:24 25:8

**fully**  48:15

**function**  11:9 25:3

**functions**  9:12

**further**  13:15

---

**G**

**gained**  12:11 28:16

**gathered**  62:25

**gave**  52:1 66:2

**gears**  11:12

**general**  20:24

**generally**  25:10 44:7

**Gerber**  17:18

**give**  11:17 30:19 59:4 66:3,4

**given**  65:25 69:22

**good**  3:9 64:9 68:24

**gotcha**  12:10

**grade**  13:11

**graduate**  7:3,8,15,20

**great**  6:14 7:1

**Greenwood**  3:19 10:11,15

**guarantor**  39:22

**guess**  10:18 16:22 27:9 29:25 52:23 57:9

**guys**  54:5

---

**H**

**half**  9:23,25

**halfway**  51:12

**hand**  19:13

**hands-on**  11:20,22 15:13

**handy**  44:15 51:7

**happen**  4:21 21:16 65:12

**happened**  64:11

**happens**  35:23

**harassment**  14:10

**hard**  6:1

**he**  6:6,7,9

**head**  21:17

**Health**  22:3,10

**help**  30:18 33:6

**helped**  30:19 33:7

**her**  16:8 50:8,9 52:1 54:24 55:18 64:8 65:22,23,25 66:1,2,3,4

**here**  13:19 20:4 25:7,8 27:8 52:14 55:7 59:9

**herein**  3:2

**hey**  63:14

**high**  7:3,5,6

**Highland**  3:16

**Highway**  3:18 10:11

**him**  6:8

**HIPAA**  12:2 15:3

**his**  6:8

**history**  19:1,11

**hold**  8:1 72:13

**home**  27:11 47:14 52:4,8,11,22, 23 70:3

**honestly**  17:1 28:22

**hospital**  48:9 50:7

**hospitals**  21:22

**hour**  5:19 53:21

**HR**  16:9

**hundred**  20:11 24:20

---

**I**

**ID**  48:14

**IDCFA**  16:17

**IDCSA**  14:19,24 15:4

**idea**  66:19

**identify**  12:3 38:14

**Illinois**  3:17

**imagine**  10:4

**immediate**  15:25

**immediately**  41:2 70:25

**impair**  6:23

**import**  24:23

**imported**  26:14

**in-house**  18:2

**in-state**  23:17

**included**  12:6 14:19 26:1

**includes**  26:11

**including**  42:13

**incoming**  68:7,8,18

**independent**  28:6

**Indiana**  3:19,20 7:2 10:12 14:18 21:14 73:1

**indicate**  71:17

**indicates**  34:20

**indication**  57:17 60:23

**individual**  31:8

**individuals**  16:5

**influence**  6:17

**information**  16:15 17:20 18:25 23:14 24:5 25:15,17,25 26:5,8,13 27:16,19,22 28:6,11,12 36:9 37:4 42:6 45:3 46:23 47:13 69:23

**initial**  12:7 13:13 22:25 26:4 40:24,25 42:20

**initially**  13:24 24:3 40:21

**initiate**  40:17 59:11,20 63:8,11, 17

**initiated**  63:19,22 65:1

initiating 64:14

instance 42:13 48:12 63:18

instruct 6:9

insurance 26:8

Intelligent 35:6

Interrogatories 33:2

interrogatory 33:11,14,17 34:2,
  6,14 38:19,21 45:14 49:25 50:2,
  13,14 56:10,20 62:11,23 67:20

inventory 37:10

involvement 17:24 18:20

issue 55:6

#### J

J5b 57:22

January 49:8,15 60:18 61:5,24
  62:18 65:15

Jennifer 16:7

job 8:15,21 9:12 11:9

Jude 3:1,25 4:1 6:14 16:15 53:20
  54:11 68:22 70:12 73:19

#### K

keep 44:15 61:10 66:8

Kentucky 7:14

kicked 65:22

kind 10:1 11:15,23 13:17 14:12,
  25 15:13,23 21:7,22 22:14 23:4,
  8,10 25:2,11,14,25 36:24 37:10
  39:18,22 41:7 43:9 57:15,17
  60:14

know 5:14,18,21,25 6:3 13:2
  15:3,13 16:18,19 17:10,11,20
  20:16,21,22 21:16 23:7,9 24:15,
  20,21 25:7,16,19,22 26:3 27:15
  28:16,17,22 29:16 32:5,7 35:24
  36:14 38:10 39:15 40:21 41:3
  42:16,19 59:1 61:19 63:13,22
  67:9 70:18

knowledge 12:11 14:6 26:24
  36:18 55:14

known 35:2

Krytiere 3:21

#### L

labeled 3:20 20:5

land 27:17,25

language 55:3

last 4:15,17 49:4 50:25

law 52:14,15 55:2,6

laws 15:5

lawsuit 5:3 17:3,4,8,14 40:14,
  15,17,19,22 41:1,7

lawsuits 17:25

lawyers 19:3

lay 52:18

layperson 53:2

leaking 47:22

learn 17:14

learning 11:24

least 40:24 41:6,18 42:5,20

leave 55:24 70:2

leaves 35:15

leaving 37:4

left 36:23 38:3,7 54:11 64:2

legal 10:20,23,25 18:2,7,13 21:6
  30:6

letter 22:25 23:13,14 40:24,25
  41:6,11,13,17 42:20

letters 23:18 25:22 29:12,14,16
  58:7,10

level 20:24

LEX 59:25 60:5

Lexis 70:23

Lexisnexis 27:6 59:17 60:4
  71:2,3

licensed 21:14

life 5:22

like 9:19 12:8 13:16,17 20:8,18
  23:10 26:2,14 32:8 35:5 39:18
  47:23 48:19 49:9 53:22 61:3

likely 41:4

Linda 19:12 72:13

Linda's 5:22

line 27:17,25 57:21,22 58:18,19
  59:7,22,24 60:1,8,11 61:1 70:16,
  18,21,22 71:9,10,13

lines 51:15 58:3,5,8,11,23 60:13
  68:4,6 71:19

linked 43:3,8,10,12,15 48:7,18
  65:19,20

list 32:6,8 33:19,22 36:16

listed 38:1 39:21 65:11

lists 36:5

litigation 17:23

little 5:23 6:1 11:12 17:15 28:20
  42:22 69:12

live 35:10

LLC 3:11,21

load 40:20,21 42:11

loaded 21:25 22:1,2,23 23:15
  41:3 58:6

loading 41:22 42:14

loads 41:5

locate 28:1,2

located 3:16,18 10:10

Locatesmarter 27:5,8,14

location 10:13,15

logs 57:15

Lombard 3:16

long 8:18,25 21:9 23:20,21 25:6,
  7 42:8,15 43:9

longer 35:5

look 11:12 30:23 33:13 34:8
  44:21 45:14 50:21 59:22 60:8
  61:3,13,18,20 62:11 64:7,13,18
  66:14,15 67:15 68:3,4 70:20
  71:3,8,16

looked 69:23

looking 19:18 22:14 33:11 34:13
  44:24 45:7,15 46:7,22 47:10
  58:25 67:15 68:6

KRYTIERE CHANEL WILKINS vs MED-1 SOLUTIONS                                    Job 28336
Michael Jude June 20, 2018  30(b)(6)                                     Index: looks..Nos

**looks** 35:5 49:9

**lose** 28:17

**lot** 14:8 36:17 72:12

**lower** 58:10

**lump** 39:14

---

### M

**M-A-T-E-W-A-N** 7:6

**made** 17:10 25:20 34:10 35:1 39:16 47:25 73:6

**mail** 63:7

**main** 21:6 43:23 65:15

**mainly** 9:21 12:2 38:10

**make** 5:16,22 20:9 35:7 36:2 57:23

**makes** 11:11 43:16

**making** 28:13 43:17 73:8

**manage** 10:5,8 11:3

**management** 7:18 10:2,20 18:12

**manager** 8:17 9:4

**managers** 9:14

**manual** 29:3 34:17 35:7 60:2

**manually** 24:25 28:18 31:7,12, 17,20,22,24 32:9,10,13,20 34:19, 20,25 35:1 37:11 44:5 51:22 52:6,21 56:2,4,13 59:10 63:12,16

**manually-dialed** 32:1

**many** 4:4 10:8 16:16 28:21

**March** 4:16 34:11,16 67:16

**marked** 41:20,24 50:12

**Mary's** 48:10

**Matewan** 7:6

**matter** 3:4

**maybe** 17:16 19:24 26:7 42:17

**me** 5:14,21 6:3 9:18 11:11,17 13:8 16:14 17:5,19 19:17 20:22 33:18 36:3 51:19 54:3 59:4 61:19

**mean** 14:14 18:11 21:17 31:15 42:8 56:15 58:18 59:7,12,24

60:11 67:14 70:21 71:9 72:1

**means** 37:9

**Med-1** 3:10,21 4:7,10,13,19 8:15,16,21 9:2,6,12,20 10:5,10, 15,22,23 11:2,7,13,14 12:12 13:4,21,25 15:9,17,24 16:11,16 17:3,25 18:2,7 20:3,25 21:1,3,9, 12,19 22:13,17,20 23:21,25 24:12,23 25:6 26:15,21,25 27:10, 18,23 28:5,13,21,24 29:1,5,10, 11,14,16,20,23 31:10,19,22,24 32:2,10,18 35:21 38:2,4,11 39:5, 8 40:4,10,15,19 41:8,9,14,15 42:3,23 43:6,17,18 44:7 45:11,17 46:4,9,19 47:3,17,24 49:20 50:15 51:2 52:1,19 53:3,11,16 54:16,23 55:13,15,19 56:1,15 57:18 59:18 60:19 61:25 64:5,22 65:8,18 68:15

**Med-1's** 22:21 28:13 31:3,9,14 33:14 34:14 35:17 38:21 40:12 50:13 62:21 63:3 64:16 67:19

**Med-1s** 59:16

**medical** 21:2 39:1

**medication** 6:21

**meets** 28:10

**mentioned** 5:2 6:12 12:8 13:2 15:3 23:12 35:13

**message** 12:19 38:6,11 65:25 66:2,4 71:18

**messages** 35:15 55:24

**method** 36:13

**Michael** 3:1,25 73:19

**middle** 57:21

**Mike** 55:5 69:12

**minutes** 30:22 44:21 54:1,7,8

**mirror** 65:14

**mirrors** 15:1

**misleading** 14:10

**MOLINE** 52:12 54:4,7 55:1 69:2, 5,8,11 70:5 72:10

**month** 9:25 15:13,14 19:24 21:11

**months** 4:16 9:5

**more** 10:13 15:21 16:23,24,25 20:24 52:15 60:15

**morning** 3:9

**mostly** 9:22

**move** 13:12 58:19,22 59:3 66:5

**moves** 60:5

**moving** 67:3

**multiple** 39:9,13 40:13

---

### N

**name** 3:15,23 4:24 7:5 26:8 33:22

**nationwide** 21:12,13

**nature** 8:14 14:5 17:8 62:21,22 68:7

**necessarily** 44:10 48:10

**necessary** 64:6

**need** 5:14,20 18:12 47:21 66:9 67:3 72:15

**needed** 17:11,20 32:6 52:25 60:3 65:18

**needs** 11:11 23:5,6 28:12 71:1

**Network** 22:4,10

**never** 4:9 50:8,9

**new** 26:1 40:23 41:23 42:1,10, 14,18 60:15,25 61:7 62:24 70:23, 25

**new-hire** 11:19

**next** 15:18 37:13 59:21 71:8,16

**Nicholas** 69:11 72:9

**Niper** 16:1 18:10

**Noble** 32:17 35:2

**non-collections** 9:5

**non-working** 23:11

**none** 31:11

**normal** 23:8 41:5

**normally** 24:16 39:11,12 56:8

**North** 3:18 10:11 48:13

**Nos** 54:16

KRYTIERE CHANEL WILKINS vs MED-1 SOLUTIONS
Michael Jude June 20, 2018  30(b)(6)

Job 28336
Index: notate..phone

**notate** 57:23

**notation** 71:25

**note** 57:20 58:4 60:14 63:25

**notes** 19:11 25:23 57:7,16,17 58:2 61:4 62:3,7 66:23 67:4

**nothing** 3:3 5:5

**notice** 19:14 50:18 62:13 66:16

**notices** 23:2

**number** 4:21 17:1 24:9 27:1,2, 11 31:6 32:3 33:21 34:4,7,19,21 38:23,25 41:24 42:1,13 44:4 45:18 46:3,10 47:5,8,12,16 50:6, 8 51:20 52:4,7,22,23 53:13,17 54:17,24 55:9 58:16 59:15 61:4 62:15,17,18,20,24,25 63:14,25 64:2,4,23 65:5,7,14,15,19 66:5 68:10,13 69:24 70:24 72:2,4

**numbers** 23:25 26:6,11 31:23, 24 36:9,10 37:25 41:20 45:16,22 46:7,13,24 48:14 52:11 54:12,14 55:15 58:25 59:2 60:15,25 61:7 62:1 63:5,10,15 64:3,8,12,14,17, 18 65:3,13 70:3,19

---

**O**

**object** 52:12 55:2

**objecting** 6:5

**objection** 6:9

**obtain** 21:19 23:25

**obtained** 24:8 38:22

**obtains** 22:20

**obviously** 12:2 15:3,20 17:7 21:5 26:3

**off-site** 35:7

**official** 15:14

**older** 11:7

**once** 21:23 36:19 60:3

**one** 5:25 10:13 11:6 16:20,21 17:15 19:10 22:10 23:18 24:12 33:5 35:4 39:14,16 43:16,23 44:11 47:23,25 51:6 53:24 55:17 57:12 59:4 60:15 61:13 64:10 69:24 70:1,23 71:20

**one-on-one** 10:1

**one-week** 11:20

**ones** 20:17

**online** 13:9,10

**only** 5:4,15 11:10 14:25 16:19,21 32:18 43:22 44:3 53:13 54:17 65:2 69:23 70:6

**open** 66:9,10,11

**orally** 48:21

**order** 44:1 51:23 55:13

**ordering** 72:14

**organized** 10:16

**original** 48:18

**other** 5:1,3 9:2,25 15:1,5 16:5 17:23 18:12,20 19:3 21:13,15 25:17 26:16,21 36:17 37:9 42:13 45:22 46:12 48:11 53:7 60:24 63:15 64:7,12,13 65:20 66:22

**our** 16:1,9 17:18 21:21,22 22:1,2, 10,23 23:18 24:15,22,25 25:4,22 28:19 32:16 36:6,10,22 37:15 40:7 42:9 44:5 48:14 55:21 56:19 57:7 59:13 65:13

**out** 5:18 15:2 40:25 47:21 50:21 60:3 61:10 62:10 65:13,22 66:2, 8,12 67:2 70:12 71:1

**outgoing** 33:19

**outlined** 20:4 47:12,14 49:15 58:2 61:23 67:19,25 68:11

**outlines** 34:9 44:25 62:14

**Outside** 18:22

**over** 5:13,25 9:14,15 10:24 11:21 15:6 17:15 20:8 22:17 30:23 33:23,25 42:12 44:6,22 51:16 53:11 67:8

**overall** 10:22

**oversee** 9:13 36:4

**overview** 11:17

**owe** 51:23

**own** 14:25 24:24

---

**P**

**P-I-K-E-V-I-L-L-E** 7:13

**p.m.** 72:17

**pacing** 36:13

**page** 30:12,25 33:10,14 38:18 45:7,24 46:16 49:4,10,16 50:25 51:5,9,12 57:19 58:3,13,15 59:5, 21 60:11 66:9,12,14 67:25 71:8, 17

**pages** 20:5 44:24

**paragraph** 51:10,14

**parameters** 37:2

**part** 11:9,21 13:2 60:12 71:14,23

**particular** 42:24 44:9

**parties** 3:14 14:9

**passed-away** 23:9

**passing** 13:11

**past** 21:24

**past-due** 21:2

**patient** 44:25

**payment** 43:16,19,20 44:3,7 51:11,15

**payments** 43:24

**penalty** 73:4

**pending** 5:17

**percent** 13:12 20:11 24:20

**perfect** 54:9

**perform** 25:3

**period** 31:7 33:21

**perjury** 73:5

**permission** 14:9

**person** 28:18 52:18

**person's** 12:16

**personal** 8:12

**personally** 17:5 36:4 55:17

**phone** 12:18,23 23:2,23,25 24:9 26:11,19,25 27:1,10,11,12,17,25 28:18,24 29:1,6,8 31:6,11,23,24 32:1,14 33:20,23,25 34:5,10,15

KRYTIERE CHANEL WILKINS vs MED-1 SOLUTIONS
Michael Jude June 20, 2018  30(b)(6)

Job 28336
Index: phones..really

35:15,16 36:9 37:12,19,25 38:1, 23,25 41:20,23,24 42:11,12,13, 15,21 43:17 45:16,18 46:7,10,24 47:11,14,16 50:6,8 51:20,22 52:1,4,5,6,9,11,21,22,23 53:4,17 54:12 55:22 56:6,12 57:18,23 58:24,25 59:2,15 60:15,25 61:2, 3,7 62:1,15,18,20,24 63:5,10,15, 25 64:2,3,7,12,14,17,22 65:3,7, 13,14 66:5 67:12,21 68:10,16,19 70:3,19,24 71:3,5

**phones** 12:15 35:19

**pick** 57:24

**picked** 65:6

**Pikeville** 7:13,14

**place** 29:1 32:19 52:5,21 56:6

**placed** 31:5,12,19 32:1,15,16 33:20 34:16 37:8 40:9,16,18 41:8,14 43:1,6 53:4 57:18,25 58:1 67:21 68:16,17 69:15 71:6

**places** 28:24 31:11

**placing** 9:7 11:8 29:5 30:2 35:20

**plaintiff** 31:20 33:23,24 39:6 45:4 50:4,6,9 56:16

**plaintiff's** 3:14 19:14 30:13 31:5 33:1,20 38:23,25 50:5 65:19

**platform** 35:18

**please** 3:23 5:15,23 6:3,8 19:17 20:22 30:22,25 31:3 32:23 33:13, 17,19,21 34:8 36:3 38:17 44:17, 21 48:24 49:4 50:2,21 51:5 56:24 58:12 67:1

**plenty** 54:2

**point** 5:15 26:18,23 36:12 60:7 71:7

**point-and-click** 25:12

**policies** 39:8 40:12 63:3 64:16

**pops** 5:20

**portion** 34:9 44:25 51:24

**portions** 66:22

**post** 7:24

**practices** 13:6 14:3 15:2

**pre-marked** 19:13

**pre-populated** 25:14

**pre-recorded** 12:19

**precede** 66:23

**preliminary** 5:13

**preparation** 19:6

**prepare** 18:17,23 30:18 33:6

**preparing** 17:22

**prepped** 23:18

**prepping** 17:11

**prescription** 6:20

**presented** 57:10

**presently** 65:11,17

**president** 16:7

**presumably** 66:22 72:3,6

**pretty** 10:1 14:5 17:9 18:1 19:24

**prevent** 12:14

**prevention** 12:3

**previous** 9:24 42:5,6 59:25 60:1 71:10

**primarily** 21:14 26:4,9 29:3 32:4 37:7,17 62:19

**principal** 38:25

**prior** 8:24 25:9 42:18 62:14

**probably** 9:23 17:7 19:23 24:16 40:23 42:16,19

**problem** 5:1 69:8

**procedurally** 5:10

**Procedure** 3:12

**procedures** 63:4 64:16

**proceeding** 6:24

**process** 22:21 24:11 25:1 26:4 27:14 35:25 41:22 65:6

**processes** 23:1

**production** 9:13

**profession** 8:1

**program** 11:15,18,20 12:9 15:15 25:3,5

**progressed** 15:16

**prohibit** 14:7

**prohibits** 14:8,10,12

**promoted** 15:17

**prospective** 30:3

**Protection** 12:4

**provide** 21:4,6 22:11 37:3 45:22 46:12 47:16 51:17,20

**provided** 24:3,6 25:18 27:1,11, 22 34:2,5 42:6 45:4,18 46:10,23, 24 47:4,7 50:4,7 52:4 53:13,17 54:12,14,17,25 55:9,16 58:9 60:25 64:5 65:8 69:14,17

**provider** 26:7 39:1

**providing** 16:14 17:21

**pull** 47:21 50:21 62:10 66:12 67:1 70:12

**purportedly** 51:25

**purpose** 29:8

**purposes** 29:9

**pursuant** 3:11

**put** 17:1 65:24 66:25

**Q**

**question** 5:24 6:3,8,10 27:8 28:22 29:13 60:1 64:9 69:3

**questions** 3:8 5:17 6:6,11 10:3 20:10,20 68:22 69:11 70:6,11

**quick** 53:24

**quickly** 17:10 50:22

**R**

**ran** 59:19 60:19 61:25

**rarely** 11:10

**read** 31:3 33:17 38:21 50:2 51:19 73:5

**reading** 52:3 53:1 60:22

**reads** 53:9

**realize** 55:21

**really** 10:25

**reason** 56:4

**recap** 47:15 54:15

**received** 13:3,14,23 14:18 26:1 38:24 48:19 60:15 70:19

**receives** 22:22 24:12

**receiving** 23:20 61:7 62:1

**recess** 54:10

**recite** 38:9

**recognized** 65:9

**record** 3:24 6:9

**records** 67:12 68:19

**REDIRECT** 70:10

**refer** 12:5 22:6 51:2 56:9 67:2

**reference** 45:8,15 47:17,18 57:11 61:11 62:7 67:9

**references** 46:18

**referred** 39:2 50:13 68:8

**referring** 49:10

**refers** 56:21

**reflect** 45:3

**reflected** 56:19 68:18

**reflects** 59:18 69:14

**regard** 17:24

**regarding** 17:9 40:16 47:22,25 48:20 61:7

**registration** 24:11

**regulations** 15:2

**relate** 39:8 40:12

**related** 4:10 13:5 17:9,23 39:5 46:4 54:22

**relates** 40:3 63:4

**relating** 3:4 41:14 42:24 48:6

**relation** 27:23 43:16 45:19,25 46:13 47:3 49:20 54:25

**relationship** 22:12 35:17

**relevant** 31:6 33:21

**remember** 4:21,24 14:11

**remove** 63:15

**removed** 63:25

**repeat** 43:4

**rephrase** 6:4 22:16 52:16,17 55:8

**report** 16:6,7 36:5,8,11

**reporting** 9:22 15:6,23

**reports** 9:23

**represent** 57:17

**reprimanded** 16:11

**request** 30:13 31:1,3,4,10,15,18 44:2

**requested** 23:16 41:6

**requesting** 32:5

**requests** 19:9

**required** 15:17

**research** 14:25

**reserve** 69:6

**reside** 7:1

**respectively** 51:3 54:22

**respond** 5:16,24

**responding** 6:7

**response** 30:13 31:10,14 33:1, 14 34:5,14 38:21,23 50:3,6,14 56:10,20 60:6,7 62:22 67:20

**responses** 18:18 33:7

**Responsibility** 51:11,15

**responsible** 9:7 11:7

**restrictions** 14:12

**result** 71:15

**resulted** 61:6 62:1

**results** 28:10,11 36:20 58:9 60:12,23 71:23

**return** 63:7

**review** 62:6

**reviewed** 18:25 19:5 23:16 65:3

**reviewing** 53:10 57:15,16

**revoke** 28:17

**revoked** 50:9

**revolving** 20:13

**right** 6:14 20:24 32:22,25 49:1 57:2,19 59:8 66:7,14,25 69:6 70:16 72:14

**right-hand** 67:25

**role** 8:18,19,20,25 9:10,20 10:5 12:10,12 15:18,24 17:22 29:19

**roles** 9:2 11:7

**room** 6:2

**roughly** 68:3,4

**route** 39:15,21 40:1

**route-tied** 48:16 69:21

**routes** 43:13

**RP** 58:23

**Rule** 3:11

**Rules** 3:12

**run** 25:1 26:15 27:4,18 36:5,8 61:6 63:1 64:6,24 65:13

**running** 64:19

**runs** 26:21,25

---

## S

**safe** 62:23 64:21,25

**said** 3:4 24:19 37:21 39:18,25 70:13

**Sales** 14:19

**same** 6:2 28:1 37:10,14 39:9,13, 21,22 40:1,13,16 41:15,23 42:6 43:9,14 46:17 47:1 48:6,18 50:19 60:11 61:22 65:12 71:9

**say** 10:19 11:25 15:25 16:22,24 41:23 43:21 48:8 58:15,23 60:15 62:23 63:2 64:21,25

**says** 35:11 38:10 51:11

**scan** 26:18

**scanned** 25:21

**schedule** 36:12

**school** 7:3,5,6,20

**schools** 7:22,24

**screen** 43:14

**scripting** 55:21

**scrub** 26:19,25 27:9,18 28:2,5

**scrubs** 23:2 26:20,21 27:21 28:9

**se** 12:9

**search** 59:14 63:8

**second** 43:25 45:7 51:5,9 59:4

**section** 45:3

**see** 5:19 19:22 23:9 34:1 39:22, 23 43:13,14 49:11 51:17 58:7,10 64:13 70:18 71:25

**seed** 40:7 43:23 44:11 47:23,25 48:20 65:4,11,15,20

**seeing** 5:7

**seem** 10:18

**seen** 19:20 30:17,20 33:5,8 44:20 49:3 67:13 71:5

**send** 24:4 29:12,14

**sending** 71:21

**sends** 23:13 24:18 41:11

**senior** 16:1,3

**sent** 22:1,24 23:14 24:21 29:16 41:13 60:4

**sentence** 51:16,19

**separate** 39:5

**series** 23:1

**service** 11:22 26:6 53:15

**services** 21:2,3,6 22:11 39:1

**set** 32:22 33:1 37:1,2 44:13 56:23 66:7

**seven** 38:18

**several** 21:13

**she** 5:24 17:20 45:22 46:12 47:7 54:14 63:24,25 64:1 65:23

**shift** 11:12

**short** 9:4 14:19 22:6

**shorthand** 12:5

**should** 19:14 32:25 41:18,20 43:10 44:12 45:8,25 48:23 51:9, 10 64:11,13

**show** 42:9 58:5

**showing** 71:2

**side** 28:19

**side-by-sides** 11:24

**signature** 50:24

**signed** 23:18 49:7,19 50:6,20 54:14

**similarly** 53:1

**simply** 64:7

**since** 6:1 13:13

**sir** 3:23 6:13

**site** 24:16

**situation** 42:22 48:17 65:12

**situations** 28:9 32:13 48:5

**six** 39:23

**skim** 20:8

**skip** 59:11

**skip-tracing** 63:4

**skiptrace** 59:11,12,14,16,19,20 60:3,19,24 61:6,25 62:21,25 63:9,11,17,20,23 64:6,15,19,24 65:2,6,18,24 70:19

**SKP** 59:8 60:1 65:24

**SMA** 59:8

**software** 22:24 25:3,5 28:1 36:6

**Solutions** 3:11,21 20:25 21:1 38:11

**some** 6:5 17:20 20:10 28:10 30:19 33:7

**somebody** 66:3

**someone** 32:4 44:2 55:22

**something** 17:9 23:6,10 32:8

**sometime** 60:18 61:24

**sorry** 4:25 13:22 14:14 16:2 22:2 24:19 27:14 29:13 30:3 37:21 43:4,5 54:6 56:3 62:5 66:10,17 71:22

**sort** 7:19 10:21 13:24 15:16,18 28:1,10,11 37:1,3 39:25 47:15 53:10 61:22 66:15 71:9

**Sounds** 68:24

**South** 3:16 48:13

**Southern** 3:20

**speaking** 14:9 18:22 28:2 55:22

**specific** 26:23 30:1 55:3 68:15

**specifically** 14:21 33:11 44:2,8 52:8,15 71:14

**spend** 9:22

**spoke** 33:23,24 50:8 69:12

**St** 48:9

**staff** 10:2

**stamp** 58:8 61:2 62:3 71:20

**stamps** 61:3

**stands** 65:17

**start** 17:11 36:13,14,15

**started** 11:14 15:8 42:25

**starting** 60:13

**starts** 51:16

**state** 3:23 7:1 34:14 38:22 50:4 52:8 73:1

**states** 21:13,15,16 30:12

**stating** 64:1

**statistics** 9:24

**status** 23:5,7,11 25:16 37:16,18, 23 40:23 41:4,19 58:20

**statute** 14:4

**statutes** 14:11

**Stepping** 28:20

**still** 5:12 11:9 69:18

**stint** 9:4

**stop** 36:14 39:3 48:21 50:10

**stopped** 65:23

**strike** 33:13

**study** 7:17

**stuff** 15:23 36:24

**subject** 29:20,23

**subsequent** 69:7

**subsequently** 21:20

**subsequently-placed** 41:16

42:4

**substance** 38:6

**substantially** 50:19

**such** 24:13 26:7 52:6

**sued** 8:9,11 16:16

**suggests** 67:20

**supervisor** 15:25 18:10

**sure** 5:8,16 10:17 19:10,23 20:9 22:14 26:22 42:15 57:19

**switch** 44:5

**sworn** 3:2

**system** 11:24 12:24 20:14 22:1, 2 23:4,13 24:24 27:15 28:13 32:17 35:2,12 36:10,22 37:15 41:25 42:9 48:15 56:19 57:8 58:4,19 60:2,4 65:13

**systems** 11:22 15:22 32:17 35:3

**sytem** 27:4

---

**T**

---

**table** 34:1,5,9 62:14

**tactic** 58:22

**take** 5:14,17,22 13:11 23:21 24:25 30:22 50:21 53:22

**taken** 3:13 43:20 54:10

**takes** 44:21

**taking** 6:20 11:23

**talking** 5:25

**Tara** 17:18

**Taylor** 16:7

**TCPA** 12:5,6,9,13,14,17,22 15:4 16:17 29:23

**team** 9:14

**technical** 14:5

**technology** 20:10,14 35:14,23 36:19

**technology-related** 20:17

**telephone** 11:8 12:4,24

**telephonically** 3:13

**tell** 3:3 6:24 19:17 57:10

**ten** 16:25 23:3 54:3

**tend** 17:11

**terms** 9:19

**test** 13:11

**testified** 3:5 5:2 18:5 29:10 34:18 56:1 63:19

**testify** 15:10 20:18

**testifying** 18:16 20:7

**testimony** 17:21 47:22 69:12 73:9

**theft** 12:3

**thing** 5:15 41:7 61:22 71:9

**things** 5:13 14:8 47:23

**think** 4:16 10:17 12:7 16:8 18:20 20:19 21:11 24:16 25:24 26:22 27:6,7 31:13 38:9 52:13 55:5

**third** 14:9 43:25 51:14,16

**third-party** 21:1,10 22:17 29:20

**three** 8:19 39:1,5,24 44:4 45:24 48:4 51:15 59:11 60:17 65:5 66:25 69:20 70:25

**three-hour** 13:10

**through** 9:18 11:13 12:11 14:25 19:17 20:5 22:25 24:11,22 25:4 26:15,17,19 27:4,5,13 29:19 32:16,17 35:2,25 36:6 37:9 51:25 52:19 53:2 58:4,8,21 67:4 71:19, 21,22

**throughout** 9:6 20:20

**Thursday** 37:13

**tie** 39:20

**tied** 39:14 40:1,4 48:3,11 62:2

**time** 4:15 5:18 11:19 12:2 14:11, 12 16:10 17:18 19:12 31:6 33:19, 21 36:12,13,14 45:1,4,17,19,23 46:8,13,23 47:7 53:11 54:2,10 55:23 56:19 61:6 64:23 65:2 68:22 69:22 72:17

**times** 4:4,6 16:16 18:11

**title** 8:15,21 16:2,9 30:12 33:22 51:10

**titled** 32:25

**today** 6:6 18:16,24 19:25 58:7

**today's** 6:24 20:13

**together** 39:14 43:8,11,12,14 48:3,7,16,18 60:14 62:3 69:21

**told** 63:13 64:1

**top** 21:17 35:4 49:11 66:6,15

**topic** 20:20

**topics** 20:4,8,15

**touch** 18:12

**touched** 25:24

**towards** 67:16

**trade** 7:22

**train** 15:21

**trained** 14:23 15:5

**trainer** 8:24

**training** 11:13,15,17,19,25 12:1, 6 13:3,4,13,15,18,20,23,24 14:17,20 15:14,15,18,22

**transcript** 73:6,9

**transfer** 35:10 36:15 70:24

**transferred** 21:21 59:10

**transitioning** 15:19,21

**true** 73:8

**truth** 3:3,4 6:24

**Tuesday** 37:12

**turn** 28:9 30:7,25 32:23 33:10 38:17 44:17 45:24 46:16 47:20 48:24 49:4,22,25 51:5 56:25 58:12 61:11 70:16

**turning** 8:14 38:17 47:21 59:21 67:24

**turns** 22:16

**two** 20:5 21:8 30:25 33:14 43:3, 5,7,13 44:24 48:5,10,17 49:11,16 54:20,22 55:10 56:12 58:5,8 65:5

**two-** 13:9

**type** 7:24 34:13 67:19

**types** 21:3

**typical** 9:18,21 22:21

KRYTIERE CHANEL WILKINS vs MED-1 SOLUTIONS
Michael Jude June 20, 2018  30(b)(6)

Job 28336
Index: typically..years

**typically** 17:4 34:20,23 56:3,5

**U**

**U.S.** 3:18 10:11

**umbrella** 10:22 11:2

**un** 12:14

**under** 6:17 10:22 11:2,3 12:17, 22 28:23 30:5 39:21 40:12 41:21 42:14 51:14 73:4

**undersigned** 73:4

**understand** 6:2 11:6 14:4,22 31:14

**understanding** 12:13,17,22 13:25 14:6,23 20:2 24:10 31:9,16 36:25 45:6 52:18,24 67:11

**Understood** 65:17

**unfair** 14:2 15:1

**unless** 41:2

**until** 5:23 53:16

**unwanted** 12:14

**up** 5:20 16:12 37:11 57:24 63:9 65:6,15 66:1,5

**up/hang** 57:24

**update** 36:22 48:4

**updated** 42:9 70:1

**upload** 25:1 36:10,11

**uploaded** 24:15

**upon** 28:25 30:4 35:21 38:3 50:14

**use** 25:2,13 27:15 31:25 35:6,12, 18 37:15 53:23

**used** 27:7 35:5 70:3

**user** 57:22

**using** 12:19,23 25:6

**usually** 23:23 40:2

**V**

**vendor** 59:14,16

**verification** 28:6

**verify** 27:22,24

**versus** 39:23 48:13

**vice** 16:7

**video** 13:8

**violations** 16:17

**Virginia** 7:7

**voapmeb** 58:11

**Voapps** 35:11,13,14,17,18,20 36:4,11 37:2,4,9,13 38:3,7,15 58:2,7 67:21 68:13,17 71:14,18, 22 72:1

**Voapps'** 36:21

**voice** 35:12

**voicemail** 35:14 36:23 37:2,5,13 38:14 58:1 68:14,17 72:2

**voicemails** 38:2,8

**W**

**wait** 5:23 6:8

**walk** 9:18 35:25

**wanted** 32:7 44:3

**watching** 11:23

**WAV** 38:5

**website** 36:21

**week** 9:24 15:15 23:3

**week-long** 15:10

**well** 6:14 10:18 14:2 17:7,22 18:10 29:4 39:11 42:2 54:13 58:15 61:19 63:11,17 67:5 69:7 70:23

**went** 48:9,12

**West** 7:7

**whichever** 51:6

**whole** 3:3 36:17

**Wilkins** 3:21 27:23 29:17 31:12 45:16,18 46:8,10,23,25 47:4,15 49:7,19 50:16 51:25 53:12,17 54:14,17,24 59:19 60:19 61:8,25 63:1 64:6

**Wilkins'** 24:5,9 27:18 68:19

**Windows-based** 25:11

**Winger** 16:9

**word** 38:9

**words** 53:7 60:24

**work** 5:9 10:18 23:5 25:16,19 32:7 43:22 65:16

**workflow** 23:8

**working** 4:7,19 11:14 13:4 15:8 36:18

**works** 25:10 36:19

**written** 16:11

**wrong** 63:14 64:1

**Y**

**year** 4:17 9:3 17:15 42:16

**yearly** 13:19

**years** 8:19 9:1 21:11 25:8